Catherine WALSH et al., Plaintiffs,

v.

LOUISIANA HIGH SCHOOL ATHLETIC ASSOCIATION et al., Defendants.

Civ. A. No. 75-2458.

United States District Court, E. D. Louisiana.

March 17, 1977.

---

Talley, Anthony, Hughes & Knight,
Charles M. Hughes, Bogalusa, La., for Loui-

siana High School and Lutheran High School.

Thomas L. Giraud, New Orleans, La., for Lutheran High School Assoc.

Gauche, Wegener & Oster, Robert J. Oster, Edmund T. Wegener, Jr., New Orleans, La., for Intervenor Etienne D'Arensbourg.

ALVIN B. RUBIN, District Judge:

This suit challenges the constitutionality of the "transfer rule", adopted by the Louisiana High School Athletic Association. That rule restricts the eligibility of a child to compete in inter-scholastic high school athletic contests if the child, upon completion of the seventh or eighth grade, enrolls in any high school other than the one in the child's home district. The constitutional challenge is to the rule as applied to children who have attended Lutheran parochial elementary schools and wish to attend the only Lutheran High School available to them, a school not in their home district. For the reasons set forth below, while the regulation withstands the constitutional attacks made on the basis that it encroaches on religious freedom and denies due process, it is unconstitutional because it denies the plaintiffs equal protection of the law; therefore it is hereby declared unenforceable.

The plaintiffs are the parents of children who are attending Lutheran High School. The defendants are both the Louisiana High School Athletic Association (LHSAA)[1] and the Lutheran High School Association of Greater New Orleans, which operates the Lutheran High School and is therefore sympathetically allied with the plaintiffs. Plaintiffs' children attended private elementary schools in New Orleans sponsored by Lutheran religious groups. In 1975 these children matriculated in Lutheran High School.

LHSAA, through the Lutheran High School Association of Greater New Orleans, ruled each of the plaintiffs' children ineligible to compete in inter-scholastic athletic competition for the school term 1975–76 because of provisions in the by-laws of the LHSAA (the "transfer rule").[2] The claims with respect to these particular children became moot when that school year ended, but at least one subsequently added plaintiff has a child affected by the rule and some of the parents have other children who will likely be affected by it soon. Therefore, in a separate opinion dated September 20, 1976, the Court decided that the suit is not moot.

The "transfer rule", set forth in full in the footnotes,[3] designates an attendance zone for each public high school in the state. No separate attendance zones are set for private or parochial high schools; each is considered to have the same attendance zone as the public high school that is located in the zone where its building is situated. To be eligible for inter-scholastic athletic competition, students who complete elementary school or junior high school must attend the high school located in the same attendance zone as their elementary school (or the high school in the zone where they

---

1. The association is a voluntary organization of Louisiana public, private and parochial high schools. It has no individual membership. Neither the principals, nor administrative officials, nor coaches, nor students are members. Each member high school is represented in the Association by its principal. Its purpose is to promote, regulate and direct the inter-scholastic athletic activity of member schools. To this end, it makes rules governing competitive athletic activities between its members.

2. Rule 1—No student who enrolls in one high school and later transfers to, or enrolls in another, shall be eligible to represent the latter school in any athletic contest.

3. A student shall be considered as enrolled in a high school when he has enrolled and attended any class in that school. Attendance in any class constitutes enrollment.

EXCEPTION I—A student who has attended a one-, two- or three-year high school at the high school level may, upon completion of all grades offered by that school, become eligible at once to participate in athletics upon transferring to a senior high school in his district.

A student may transfer upon the completion of the 7th or 8th grade to any high school in his home district and be eligible immediately.

EXCEPTION II—Any student after completing one year's attendance from date of enrollment in a high school, and fulfilling all other requirements, becomes eligible.

reside), with certain exceptions created by the LHSAA or the parish school boards for special high schools.

The geographical attendance zone imposed on Lutheran High by LHSAA does not include any of the Lutheran elementary schools. Therefore, when a child completes any of the seven Lutheran elementary schools in the parish and, in order to continue his parochial education, matriculates in the Lutheran High School, he automatically loses one year of eligibility to compete in inter-scholastic athletics. All students in the 9th grade at Lutheran High School since its opening have therefore been ineligible to compete in inter-scholastic athletics for one year.

The transfer rule was adopted to prevent recruiting of school children by overzealous athletic coaches, fans, and school faculty. High schools, public and private, eager to enlist promising athletes, were urging students who would otherwise attend another school to change the school they would attend in order to enhance the quality of the teams at the recruiting school. Some alumni associations, athletic clubs, and even principals and coaches resorted to various expedients unrelated to educational goals to recruit promising student athletes. Therefore promising young athletes were being subjected to inducements to go to one school or another purely to enable the school to field a better team. This unwholesome situation was one of the main reasons that brought about the formation of LHSAA. All parties to this suit agree that this sort of recruiting of school children to engage in athletic competition may be considered harmful by the state, and that it may take steps to prevent this harm.

The LHSAA is a voluntary association of some 447 high schools in Louisiana, which regulates inter-scholastic athletic competition among the schools. Although membership in it is voluntary, a school must belong in order to compete with other schools; its

activities, sanctioned by the state, constitute state action in the constitutional sense. *Louisiana High School Athletic Association v. St. Augustine High School*, 5 Cir. 1968, 396 F.2d 224.

Four New Orleans public schools are exempt, at least to some degree, from the transfer rule in Orleans Parish. Students from the entire parish are permitted to attend Ben Franklin High School, which limits enrollment to students who have demonstrated high achievement on entrance tests and above average grades in elementary school; parish-wide enrollment is also permitted in Booker T. Washington School, which has a vocational education curriculum; in McMain Magnet Senior High (except for a small area within the Fortier High School attendance district); and in McDonogh 35 School.[4] Because the school board permits students from other attendance zones to matriculate at these schools, the LHSAA has modified its rules to exempt them from the transfer rule.

There are some who dispute the desirability of competitive inter-scholastic athletics in high schools. The parties to this suit all consider such competition not only appropriate but desirable. Many students who value inter-scholastic athletics have either no interest in participation or lack the athletic ability to do so. Losing a year of varsity eligibility is meaningless to the young person who has no interest in intermural sports. But it may be significant to the youngster who desires to participate in high school athletics. The testimony in this case has established that athletic competition is important to some of the children of the plaintiffs. In addition, testimony was offered to show that students who achieve membership on school athletic teams enjoy higher peer group esteem, may achieve better grades, and tend to be more self-reliant than other classmates. At the same time it must be recognized that these youngsters are usually 14 or 15 years old. They would be competing for places with older students,

---

4. McDonogh 35 High School has two curricula, one for "college preparatory" students and the other designated as the "normal" program. The former which has city-wide attendance in the college preparatory curriculum is permitted. See transcript, April 1, 1976, testimony of Carroll Breeland.

who are probably more developed. They may engage in intra-scholastic athletic activities and team training, but they are barred from inter-scholastic contests. They are thus deprived of a chance to develop their skills in a competitive context, of motivation to practice, and of the prestige of being a team member.

The state's interest must be weighed in the opposite side of the balance. The state has an interest in regulating inter-mural competition. The testimony offered by the LHSAA is persuasive that no plan of regulating recruiting is effective other than that of limiting the alternatives available to students. It is doubtful that case by case adjudication could effectively regulate the traffic in athletes. Individual inquiry on a case by case basis would involve a panoply of inquiry, hearing, and decision-making. If recruiting occurred, neither of the parties to the successful evasion of the regulations would complain, nor would either be likely willingly to furnish evidence. The likely complainants would be opposing schools, which would have as little chance to prove their case as other prosecutors of consensual crimes. They would have no staff of investigators and no way to develop facts. Nor is any such staff available from any other source to investigate complaints. In addition, both the experience of the Association before the rule was adopted and the recurrent problems of collegiate regulation make it doubtful that the punishment of recruitment once it has occurred, even if later detected and proved, is sufficient to prevent recruitment. The time interval between enrollment of the 9th grade student in high school and his participation in an athletic event make it almost inevitable that the hearings to investigate whether or not illicit recruiting had taken place would occur after athletic events had taken place. Prophylaxis is not only more feasible than punishment; it may be the only effective way to deal with the problem. Hence as a pragmatic matter, the only feasible method is to adopt a clear, readily understandable and easily enforceable rule.

Plaintiffs claim the application of the "transfer rule" to them and their children violates their right to free exercise of religion guaranteed by the 1st and 14th Amendments to the Constitution of the United States because it discourages athletically talented and interested children from attending religious schools; they also contend that they are denied due process and equal protection on grounds more fully set forth below.

## I. JURISDICTION

Section 1343 of the Judicial Code, 28 U.S.C. § 1343 provides:

The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

\* \* \* \* \* \*

(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States

The "right, privilege or immunity" that is alleged to be abridged by the transfer rule is not the ability to engage in athletics; that issue would be raised only if the state barred athletic competition to all children who enter high school. If the state chose to eliminate inter-scholastic athletics, no substantial federal question would be raised because the privilege of participating in athletic competition per se is not protected by the due process clause. *Mitchell v. Louisiana High School Athletic Association*, 5th Cir. 1970, 430 F.2d 1155. The issue here is whether, when the state permits children who attend some schools to engage in inter-scholastic athletics, it may deny that opportunity to those who attend a school selected for religious reasons. The substantial federal questions at issue are whether the state may abridge religious freedom by encroaching on an individual's practices in the performance of activities that do not per se enjoy constitutional protection,[5] and wheth-

---

5. The opinion in *Albach v. Odle*, 10th Cir. 1976, 531 F.2d 983, confirms this criterion. It holds that an attack on a rule automatically barring from all inter-scholastic high school athletic

er the manner that it has chosen violates the constitutional rights to equal protection and due process of the law.

## II. THE RIGHT TO FREE EXERCISE OF RELIGION

■ The right to free exercise of religion is guaranteed by the First Amendment to the Constitution of the United States. That buckler protects the right to attend religious schools instead of public institutions, not only as a form of religious exercise but also because the Constitution implies a guarantee of liberty to parents and guardians that permits them to direct the education and rearing of children under their control. *Pierce v. Society of Sisters*, 1925, 268 U.S. 510, 534, 45 S.Ct. 571, 573, 69 L.Ed. 1070. Compare *Wisconsin v. Yoder*, 1972, 406 U.S. 205 at 232, 92 S.Ct. 1526, 32 L.Ed.2d 15.

In *Gillette v. United States*, 1971, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168, the Supreme Court summed up the principles that guide decision:

. . . [T]he Free Exercise Clause bars "governmental regulation of religious beliefs as such," *Sherbert v. Verner*, 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965 (1963), or interference with the dissemination of religious ideas. See *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 828 (1953); *Follett v. McCormick*, 321 U.S. 573, 64 S.Ct. 717, 88 L.Ed. 938 (1944); *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943). It prohibits misuse of secular governmental programs "to impede the observance of one or all religions or . . . to discriminate invidiously between religions, . . . even though the burden may be characterized as being

only indirect." *Braunfeld v. Brown*, 366 U.S. 599, at 607, 81 S.Ct. 1144, at 1148, 6 L.Ed.2d 563 (opinion of Warren, C. J.). And even as to neutral prohibitory or regulatory laws having secular aims, the Free Exercise Clause may condemn certain applications clashing with imperatives of religion and conscience, when the burden on First Amendment values is not justifiable in terms of the Government's valid aims.

401 U.S., at 462, 91 S.Ct. at 842.

The challenged transfer rule is a neutral regulation with secular objectives. The court's function is to determine whether in this instance "the burden on First Amendment values is justifiable in terms of the [Association's] valid aims." It is not enough that the transfer rule is appropriate to achieve a valid secular end; the value to society must be measured in some way against the impediment to which the regulation subjects those whose practices are affected by it. See concurring opinion of Mr. Justice Frankfurter, in *McGowan v. Maryland*, 1901, 366 U.S. 420, 81 S.Ct. 1153, 6 L.Ed.2d 393. The transfer rule permits the continuation of religious education at a price: forfeiture of a year of athletic participation upon entry into high school. The issue is whether the price is more than the state may exact.

There is no standard of constitutional weights and measures by which to test the scales. If a person whose religious beliefs forbid her to work on Saturday must forfeit, by her refusal to do so, unemployment compensation benefits otherwise due, such regulation unfairly burdens her free exercise of religion by compelling her to choose between the principles of her faith and the governmental benefits available to others. *Sherbert v. Verner*, 1963, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965.[6]

competition for one year any student who transfers to a school or from a boarding school to his home district failed to raise a substantial federal question. In that case it was not alleged that the rule had any adverse impact on First Amendment rights. The court expressly said, " . . . [H]igh school athletic regulations must survive constitutional scrutiny."

**6.** The principles of *Sherbert v. Verner*, supra, control decision here. The result is different

because the encroachment is not in my opinion substantial, and the government interest is compelling both because it regulates an action that requires governmental intervention and does so on the only practicable fashion.

In *Sherbert v. Verner*, the court refused to overrule *Braunfeld v. Brown*, supra (in which a Sunday closing law was held constitutional despite its impact on an Orthodox Jew). In its opinion, written by Mr. Justice Brennan, the Court first found that the South Carolina stat-

On the other hand, a person whose religious beliefs cause him to object conscientiously to certain wars but not to all may be required to participate in what he sincerely considers an unjust one or go to jail. *Gillette v. United States*, supra. A person whose religious beliefs make him a conscientious objector and cause him to choose civilian service may be denied educational benefits given to those who engage in more onerous or lengthy military service, *Johnson v. Robison*, 1974, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389; a female less than eighteen years of age may be prohibited from selling periodicals in a public place despite the fact that, as a Jehovah's Witness, she believes it is her religious duty to perform this work, *Prince v. Commonwealth of Massachusetts*, 1944, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645; and Orthodox Jews may be required to close their businesses on Sunday even though they observe the Sabbath on the Seventh Day, *Braunfeld v. Brown*, 1961, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563.

Even more direct encroachment on religious beliefs is permitted when the governmental interest is stronger; thus a Mormon who takes more than one wife in accordance with a duty imposed upon him by the precepts of the Church of Jesus Christ of the Latter Day Saints may be jailed for polygamy. *Reynolds v. United States*, 1878, 98 U.S. 145, 25 L.Ed. 244.

■ The measure that must be employed is not one of equal balance. In this area, balanced scales weigh against government regulation. The state must have a compelling interest in the regulation in question, *Johnson v. Robison*, supra, 415 U.S. at 384,

385, 94 S.Ct. at 1175, and there must be no equally effective alternative means to achieve the state's objective. *Cantwell v. Connecticut*, 1940, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213, and other cases cited by the Justice Frankfurter in his concurrence in *McGowan v. State of Maryland*, supra, 366 U.S. at 464, 81 S.Ct. at 1155. These precepts were reiterated in *Wisconsin v. Yoder*:

> It follows that in order for Wisconsin to compel school attendance beyond the eighth grade against a claim that such attendance interferes with the practice of a legitimate religious belief, it must appear either that the State does not deny the free exercise of religious belief by its requirement, or that there is a state interest of sufficient magnitude to override the interest claiming protection under the Free Exercise Clause.

1972, 406 U.S. 205, 214, 92 S.Ct. 1526, 1532.

Where secular regulatory statutes of a state affect religious observance in some way, they have been challenged in a host of cases. Appendix A contains an excerpt from Dorsen, Bender, and Neuborne, Political and Civil Rights in the United States, 4th Edition, vol. 1., pp. 1257-1263, citing and discussing cases that have considered the constitutional conflict with religious beliefs or observances alleged to be created by compulsory vaccination laws; involuntary blood transfusions; other medical treatment; prohibition of the use of psychedelic drugs; requirements relative to appearance in judicial proceedings; building and zoning laws; taxation of institutions alleged to be religious; and the prohibition of fortune-

---

ute put a burden on the plaintiff's free exercise of religion. It next considered "whether some compelling state interest" justified the "*substantial* infringement of appellant's First Amendment right." 374 U.S. at 406, 83 S.Ct. at 1795. (Emphasis supplied). Implicit in its analysis is an evaluation of the degree of encroachment that results from state action [e. g., Is it minor? Is it substantial? Does it affect a fundamental tenet of the plaintiff's faith? Does it touch a lesser precept?]; the court then made a separate appraisal of the importance to the state of the ends sought to be achieved [Is the state interest compelling?] and whether any

less intrusive means might have been chosen. Finding both that there was no compelling state interest in requiring employees to work on their Sabbath, and that the statute was not necessary to achieve the purposes professed (e. g. to prevent the filing of fraudulent claims for unemployment benefits), the court held it unconstitutional. It distinguished *Braunfeld v. Brown*, supra, on the basis Sunday closing laws were adopted because of a "strong state interest in providing one uniform day of rest for all workers." 374 U.S. at 408, 83 S.Ct. at 1796.

telling, of use of alcoholic beverages, of snake-handling and of fluoridation. Where the state has adopted a general regulation with a secular purpose, the magnitude of the state interest must be weighed against the extent of the encroachment on the religious observance or belief that is incidentally affected.

Thus, a state may be required, even in operating a prison, to make pork-free food available to a person whose religious beliefs forbid him to partake of swine, *Barnett v. Rodgers*, 1969, 133 U.S.App.D.C. 296, 410 F.2d 995; the state has little affirmative interest in what kind of food prisoners eat, and it is no great problem to prepare alternative diets. The rule presumably would be different if the prisoner's religion mandated him to eat the tongues of hummingbirds and drink the milk of paradise. A state may be forbidden to compel public school attendance beyond the eighth grade where strong religious beliefs forbid it; weighed in this determination is the judgment that an eighth grade education is at least minimally sufficient to permit participation in a democratic society and that further non-institutional education would be provided. *Wisconsin v. Yoder*, supra. The result would likely be different if the parent's religious tenets required illiteracy and forbade all school attendance.[7]

The impact of the regulation on the plaintiffs has been minimal.[8] The transflaw was held constitutional despite its imer rule has not been shown to have prevented any parent from sending his child to Lutheran High or any child from attending it. Nor has it been shown to have had a significant impact on religious observance in any way.

■ A statute or state regulation may be invalid because it inhibits First Amendment rights even when it does not preclude them,

---

7. At least some cases have raised a doubt as to whether it would be constitutional to require a state agency to adjust its requirements to accommodate religious beliefs. A federal statute requires private employees reasonably to accommodate an employee's religious beliefs. See 42 U.S.C.A. § 2000e(j), as amended in 1972. Its constitutionality was upheld in *Hardison v. Trans World Airlines*, 8th Cir. 1975, 527 F.2d 33. In a Comment, Title VII, Religious Discrimination, 9 ¶ Creighton Law Review 795, 804, (1976) the author observes:

   The Establishment Clause creates problems with this analysis, however, the promotion of a particular religion, or of any religion, is not a justifiable ground for legislation. Under the test announced by the Supreme Court in *Nyquist*, [*Committee for Public Education and Religious Liberty v. Nyquist* 1973, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948], a law must have a "primary effect that neither advances nor inhibits religion." The first amendment guarantees neutrality in its religion clause. There can be little doubt that Congress enacted Title VII with secular goals in mind. However, the Act as amended in 1972 defines religion so as to require that certain persons receive preferential treatment because of their religion. Cummins [*Cummins v. Parker Seal Co.*, 6th Cir. 1975, 516 F.2d 544] suggests that it is a valid purpose of the Act to grant preferences to persons whose religious practices do not conform with the religious practices of the majority. Certain persons will not compromise their religious convictions and they should not be penalized for not doing so. However, some argue that by reasonably accommodating an employee's religious belief a priority of the religious over the secular develops.

8. The record was reopened by the court on its own motion to consider evidence concerning the effect of the transfer rule on the plaintiff and their children, and other matters. One parent testified that she has a son in elementary school who is athletically inclined; she is "concerned" about his willingness to attend Lutheran High if he cannot participate in competition sports his first year. Her older son attended another private school for reasons unrelated to the transfer rule. Her older daughter attended Lutheran High; she was disappointed that she could not participate in inter-scholastic sports but her inability to do so did not sway her acquiescence in her mother's decision to enroll her in Lutheran High.

   A father of four, who is also a Lutheran School principal, has two children in Lutheran High School and two in other Lutheran schools. His children will attend Lutheran schools regardless of the transfer rule. Another father of two, both in Lutheran elementary schools, sends his children to Lutheran schools because of his religious beliefs and the mandate of the Bible; his children will attend Lutheran High School when they reach that stage of their education. A father of three children, whose wife is of the Lutheran faith, sends his children to Lutheran schools for a Christian education; he is a Christian but not a Lutheran; the transfer rule has not deterred two of his children from attending Lutheran schools.

because of what has been appropriately called its chilling effect on the exercise of those rights. But in this case no serious inhibition either of parents or children has been shown. Even if the desire of some children, or their parents, to pursue a Lutheran education has been abated or chilled, the state interest in this regulation appears strong enough to justify it. It has already been observed that, in the present case, all agree—since all are interested in athletics—that, if inter-scholastic athletics are to continue and are to be conducted on an ethical basis, the Association must regulate recruiting. No other feasible means of regulation has been indicated. The plaintiffs have suggested sanctions against individuals who engage in recruiting or students who succumb to it. For reasons already set forth, this is not effective; indeed it was tried unsuccessfully in Orleans Parish some years ago. The only other suggestion was that the Association adopt some set of different attendance zones to apply to private and parochial schools. The testimony indicated that this was an unsatisfactory solution and might create other due process or equal protection problems. While there is only one Lutheran High School, and it considers its natural attendance area to be parish wide, at least one other faith sponsors several high schools, each of which considers its attendance area to be parish wide. In addition a large portion of the children who attend Lutheran High are not of the Lutheran faith; presumably these children would be treated differently from Lutheran children if geographic zoning were adopted. If there is an alternative that is workable, its feasibility has not been shown.

■ The Association's interest in maintaining the transfer rule is therefore strong. The encroachment upon religion is limited, and, for most children (the non-athletes), insignificant. The incidental impact

it may have on a few is not sufficient to invalidate the rule on this basis.[9]

### III. DUE PROCESS

■ There is no substantial due process issue in this case. The transfer rule is rational and bears a direct relationship to the result sought to be achieved: it effectively eliminates incentive both to recruit and to be recruited by a short-lived disqualification. All that rationality in this context requires is that the rule bear a logical relationship to its objective and have a reasonable likelihood of accomplishing it. Nor does the rule create any presumptions, irrebuttable or otherwise. The rule is merely prophylactic and its purpose is not to define the situations in which recruiting occurs, but rather to deter improper recruiting by means of a broadly sweeping rule. *Mourning v. Family Services Publications Service,* 1973, 411 U.S. 356, 377, 93 S.Ct. 1652, 1664, 36 L.Ed.2d 318. There is no pretense that the transfer rule determines the true intent of matriculating students, while making relevant evidence of intent inadmissible in an adjudication. *Weinberger v. Salfi,* 1975, 422 U.S. 749, 95 S.Ct. 2457, at 2470, 45 L.Ed.2d 522. Moreover, there is in this case no chilling of the plaintiffs' constitutionally protected rights to choose religious education. All that need be shown, therefore, is that the legislature chose "an objective criterion, one which the legislature considered to bear a sufficiently close nexus with underlying policy objectives to be used as the test for eligibility." *Weinberger v. Salfi,* supra, 95 S.Ct. at 2470. The transfer rule applies an objective standard to all 9th graders, whether in public or religious schools, and whether or not they seek to engage in inter-scholastic competition. The mere fact that some, or even most, of the 9th graders affected by the rule would not otherwise be recruited does not make the rule constitutionally infirm. The rule's

**9.** State impact on First Amendment rights is not in my opinion justified by showing merely a rational relationship to a legitimate state interest although the Louisiana Supreme Court did apply this test in determining the constitutionality of the transfer rule, *Chabert v. Louisiana*

*High School Athletic Association,* 1975, 323 So.2d 774, 779. Nevertheless for the reasons set forth in this opinion, I agree with the conclusion the court reached on the First Amendment issue.

reach may be broader than its aim. *Williamson v. Lee Optical of Oklahoma*, 1955, 343 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, reh. den. 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256.

## IV. EQUAL PROTECTION

■ As has already been pointed out, the transfer rule applies to Lutheran High (and other private and public schools), but exempts four public schools with city-wide attendance, Ben Franklin, McDonogh 35, McMain Magnet, and Booker T. Washington. In evaluating the claim that this difference in treatment violates the Equal Protection Clause, the criteria to be considered are: (1) The character of the classification in question; (2) the individual interests affected by it; and (3) the governmental interests asserted in support of it. *Dunn v. Blumstein*, 1972, 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274. See also *Brenden v. Independent School District*, 8th Cir. 1973, 477 F.2d 1292.

■ Here most public schools and all private schools are in one class, and students who enroll in them are treated one way; some public schools, (the four already named) are in another class, and their 9th grade students are treated differently. The evidence does not afford any satisfactory explanation concerning the rationale behind drawing this distinction or the governmental interest if any, that would support it.

With respect particularly to Lutheran High School, the LHSAA has shown no logical reason why it should be subject to a rule from which the four public schools are exempt. It is said that a youngster entering the 9th grade cannot merely choose to attend Ben Franklin; he must attain eligibility. But, assuming eligibility, he may attend for the same athletic competitive reasons that might encourage his Lutheran peer,[10] to attend Lutheran High. Without special eligibility, any child may attend Booker T. Washington if he elects a vocational education, whatever grade school he has completed, and may then immediately engage in athletic competition; similar voluntary area-wide enrollment is permitted in McDonogh 35 and McMain Magnet without loss of eligibility.

If the evil sought to be prohibited by the transfer rule is threatened to be brought about by children who may be recruited for athletics at Lutheran High (total enrollment 233; ninth grade enrollment 74), then it is obviously more likely to be present when a decision is made by a child and his parents that he will attend Booker T. Washington (enrollment 2016; ninth grade 366) or Ben Franklin (enrollment 752; ninth grade 203.)[11] The only justification presented in the testimony for the distinction between the public area-wide schools and Lutheran High is that recruiting has never been a problem in these four schools. However, according to the same witness, neither has recruiting been a problem in the Lutheran Schools.

The equal protection clause, as it applies here is not complex. There is no need to consider whether the differences in treatment of the Lutheran Schools and the four public schools with city-wide attendance creates a suspect classification justifying strict scrutiny. See *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 1977, —— .U.S. ——, 97 S.Ct. 555, 50 L.Ed.2d 450. The court's holding is not founded on the religious character of the plaintiff school because the transfer

---

10. Of the 233 children attending the Lutheran High School, 73% profess the Lutheran faith. See also Edwards and Kapan, Religious Discrimination and the Roll of Arbitration under Title VII, 1971, 69 Mich.L.Rev. 599, 628:

Who is to say that the desire to stay at home Sunday and do nothing is any less worthy of protection than is the need to attend church that same day? But the EEOC's standard clearly chooses the one over the other. In so doing, it misconceives not only Title VII but the delicate balance between the free exercise of religion and the operation of a secular society.

To state these views is not necessarily to adopt them.

11. These figures, accurate as of October 6, 1976, were obtained from the Public Information Office of the Orleans Parish School Board and from plaintiffs' counsel. The court was unable to find the figures in the record.

rule applies alike to all private schools, whether or not they are supported by members of a religious faith. It fails to pass equal protection muster by a less demanding standard: the division into classes must bear at least some rational relationship to the end sought to be achieved. *Williamson v. Lee Optical of Oklahoma*, 1955, 343 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563, reh. den. 349 U.S. 925, 75 S.Ct. 657, 99 L.Ed. 1256. The distinction between Lutheran High on the one hand and the four public schools on the other appears to be based on no consideration that has any logical relationship to athletic recruiting.

For these reasons, the transfer rule, as drawn in Orleans Parish, denies the plaintiffs equal protection of the laws and is declared unconstitutional.