**Dorothy VALENCIA and Joseph G. Lanzi, Individually and on behalf of all others similarly situated, Plaintiffs,**

v.

**The BLUE HEN CONFERENCE et al., Defendants.**

Civ. A. No. 79–135.

United States District Court,
D. Delaware.

Aug. 23, 1979.

**812**

Thomas Stephen Neuberger and John S. Grady, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiffs.

Edward M. McNally and P. Clarkson Collins, Jr., of Morris, James, Hitchens & Williams, Wilmington, Del., for the New Castle County School Dist., defendants.

Jeffrey M. Weiner, of Bayard, Brill & Handelman, P.A., Wilmington Del., for Vocational-Technical School, defendants.

## OPINION

LATCHUM, Chief Judge.

This is an action for declaratory and injunctive relief brought by two parents of children attending St. Mark's High School in New Castle County, Delaware, who claim that the defendants violated their constitutional rights to the free exercise of religion, equal protection and substantive due process by refusing to admit St. Mark's to the Blue Hen Conference. The plaintiffs, Dorothy Valencia and Joseph G. Lanzi, seek to proceed on their own behalf and on behalf of all other Roman Catholic parents of children at St. Mark's who participate in interscholastic athletics, whose free exercise rights have been or will be similarly infringed.[1] The defendants are the Blue Hen Conference ("BHC"), which is an unincorporated association of public high schools in New Castle County, and the principals and athletic directors of its eighteen member

schools during the academic years 1977–1978 and 1978–1979.[2] The plaintiffs have asserted claims under the First and Fourteenth Amendments and 42 U.S.C. § 1983; subject matter jurisdiction exists under 28 U.S.C. § 1343(3) and (4).

The case is presently before the Court on the plaintiffs' motion for a preliminary injunction.[3] The parties submitted extensive briefs on the issues raised by the motion and the Court heard oral argument of opposing counsel on July 30, 1979. This Opinion constitutes the Court's findings of fact and conclusions of law on the motion as required by Rule 52, F.R.Civ.P.

## BACKGROUND FACTS

Interscholastic athletics in the State of Delaware are regulated by the Delaware Secondary School Athletic Association ("DSSAA"), which functions under the auspices of the Delaware State Board of Education.[4] From the early 1930's until 1958 the rules of the DSSAA and its predecessor, the Delaware State Athletic Association, prohibited conferences. Hence, no league or conference type competition occurred in Delaware during that period.[5] In 1958, however, the rule was changed to permit the formation of conferences and shortly thereafter the Blue Hen Conference was created.[6]

Originally, the DSSAA rules authorized only public school conferences and private school conferences; no conference could include both public and private schools.[7] The BHC constitution therefore limited eligibility for membership to accredited secondary *public* institutions. Article III, Section 2 of the constitution provides: "All approved public schools in New Castle County are eligible for membership in this

---

1. The plaintiffs have filed a motion to have this class certified (Docket Item 44), but the motion is not ready for disposition at this time.

2. Docket Item 1, par. 4.

3. Docket Item 6.

4. Docket Item 57 (Deposition of Kenneth C. Madden), pp. 8–9 & Exh. F.

5. Docket Item 49 (Deposition of William C. Cole), pp. 7–9.

6. *Id.* pp. 29–31.

7. *Id.* p. 29.

Conference."[8] The DSSAA rules have since been changed to permit public and private schools to belong to the same conference.[9] The BHC, however, has not amended its rule.

The objectives of the Conference are set forth in Article II of its constitution as follows:

Sec. 1. To foster and develop amateur athletics among the member schools of this *Conference.*

Sec. 2. To equalize athletic opportunities by standardizing rules of eligibility for individuals.

Sec. 3. To supplement the physical education program of the secondary schools by making a practical application of the theories of physical activity.

Sec. 4. To promote uniformity in the arrangement and control of the athletic program.

Sec. 5. To protect the mutual interests of the members of the *Conference* through the cultivation of ideals of good sportsmanship in their relation to the development of character and good citizenship.

Sec. 6. To promote initiative, friendly relations, and cooperation among member schools.

To maintain a competitive balance among its members, the Conference is divided into two flights or divisions on the basis of size.[10] Generally, a member school will play the majority of its games in a particular sport against the other schools in its flight in the BHC. The remaining games on the schedule may be played against schools in the other flight or schools that are not in the BHC.[11]

Each high school in the Blue Hen Conference has a defined geographic area from which it may draw students. With two exceptions, these attendance areas cover only small portions of New Castle County.[12] Consequently, the athletic fortunes of most of the Conference schools depend on the students who by chance live in their respective areas.

The BHC has adopted the rules of the DSSAA concerning the eligibility of individual students to compete in athletics. Rule 1.D of the DSSAA prohibits a student athlete who transfers from one school to another from participating in athletics for five months, unless he falls within an exception, such as that pertaining to students whose parents or guardians changed residence. The rule also prohibits recruiting, providing that:

---

8. The Blue Hen Conference constitution is reproduced in part as an attachment to Docket Item 5 (Plaintiffs' First Request for Admissions).

9. The current provision in the DSSAA by-laws governing conferences reads as follows:

RULE 18. CONFERENCES AND ALL–STAR GAMES

A. Member schools may establish voluntary conference organizations according to the following rules:

1. *Any such organization may be composed of public and nonpublic schools.*

2. Any conference so formed must submit its proposed membership and bylaws to the Delaware Secondary School Athletic Association and these must be approved prior to the entering into of any contractual agreements by member schools.

All subsequent amendments to the constitution and bylaws of any conference must be approved by the Association.

Docket Item 57, Exh. F, p. 28 (emphasis supplied).

10. Docket Item 5, Att. 2 (Blue Hen Conference By Laws, Art. III, Sec. 1).

11. For example, Christiana High School is in Flight A of the BHC. It is allowed to schedule nine games for the 1979 football season. Since there are seven other schools in Flight A, Christiana must play seven of its games against Flight A opponents. The other two games may be scheduled with whatever schools Christiana chooses. Docket Item 50 (Deposition of Kenneth E. Klimek), pp. 9–10.

12. The two exceptions are: Howard Career Center and Delcastle Vocational-Technical High School. Both those schools have county-wide attendance areas, but have other, non-geographic restrictions on their ability to accept a student, such as whether an opening exists in the specific vocational or technical program in which the student is interested. Docket Item 47 (Deposition of Carson R. Herr), pp. 8–11.

The use of undue influence by anyone to cause a student to transfer for athletic purposes from one school district to another, or from one school to another within a school district, shall render the student ineligible.[13]

The existence of geographic attendance zones facilitates enforcement of this rule.

St. Mark's High School is a typical Roman Catholic secondary educational institution and is operated by the Diocese of Wilmington.[14] The school opened in September 1969 with a total enrollment of 310, all of whom were ninth graders. By 1972 the enrollment had grown to 1512 and in 1978 it was 1730.[15] Parents of children who attend St. Mark's must pay a substantial tuition fee.

In the 1971–1972 academic year St. Mark's played 40 percent of its athletic events against Blue Hen Conference schools. The percentage remained roughly the same through 1975–1976, when St. Mark's competed in 105 events against BHC schools. Since that time, however, St. Mark's has experienced increasing difficulty in scheduling events against Conference schools. Indeed, by the end of the 1978–1979 academic year, the number of athletic contests between St. Mark's and BHC schools had been cut in half.[16]

The inability of St. Mark's to schedule athletic events, particularly football games, with schools in Delaware eventually prompted the former principal of St. Mark's, the Reverend J. Thomas Cini, to apply for membership in the Blue Hen Conference. Father Cini made the application in a letter dated February 23, 1977 to the defendant Earl R. Batten, who was then President of the Blue Hen Conference.[17] The letter read in part:

To insure that our students will be able to participate in interscholastic athletics, I am making this formal application for full membership in the Blue Hen Conference. Membership will of course solve our scheduling problems and give our students the full benefit of in-state competition.

I am aware that the Blue Hen Conference has in its constitution a requirement that only public schools can belong. However, the Delaware Secondary School Athletic Association, as you know, permits any conference to be composed of public and non-public schools.

On March 3, 1977, Mr. Batten responded to Father Cini's letter and agreed to bring St. Mark's application up for discussion at the BHC meeting scheduled for March 7th.[18] There is no evidence in the record that any formal action was ever taken on the 1977 application.

By the end of 1977 Ronald Russo had succeeded Father Cini as principal of St. Mark's, and he approached several public school officials in an attempt to determine what reservations they had about admitting St. Mark's to the Blue Hen Conference. Among the problems mentioned to Mr. Russo were: (1) the fact that St. Mark's could accept students from a wide geographical area; (2) a fear that St. Mark's would dominate the other schools in the Conference; and (3) allegations that St. Mark's had engaged in illegal recruiting and awarded athletic scholarships.[19] Considering those objections to be the product of misinformation and misunderstanding, Mr. Russo attended a meeting of the athletic directors of the BHC on January 16, 1978 and renewed St. Mark's application for membership. Mr. Russo supplied the athletic directors with certain information concerning St. Mark's

---

13. Docket Item 57, Exh. F, p. 22.

14. Docket Item 61 (Affidavit of Ronald R. Russo), pars. 2, 11. The Diocese of Wilmington extends throughout Delaware and the Eastern Shore of Maryland. *Id.* par. 8.

15. Docket Item 67 (Deposition of Ronald Russo), pp. 18–20. St. Mark's has the capacity to handle about 1800 students. *Id.*

16. Docket Item 34 (Affidavit of Terry Curtis Seningen), Exh. B.

17. Docket Item 61, Exh. E.

18. *Id.* Exh. F.

19. Docket Item 61, pars. 14–18.

admissions and scholarship policies and assured them that the school was willing "to take reasonable steps to comply with any entrance requirements to the Conference" and, if admitted, would abide by all the Conference's rules. The athletic directors voted to discuss the application with their principals.[20]

At the next Conference meeting, in February, the members voted not to change the constitution to permit the membership of non-public schools.[21] Mr. Russo was informed of this decision during a telephone conversation with the defendant Plitnik about a month later. Mr. Russo then requested a written statement of the reasons for the rejection of St. Mark's application, and Plitnik sent him a letter on April 4, 1978, which stated:[22]

> The Blue Hen Conference Athletic Directors have discussed your application to the Conference and the decision was made not to change the constitution at this time. To admit non-public schools would require a constitutional change. Therefore we can not act on your application at this time.

Mr. Russo appealed the Conference's decision to the DSSAA and the State Board of Education, but both those bodies upheld the decision.[23] This suit followed.

The two named plaintiffs in this action are Roman Catholics. Mrs. Valencia is a resident of Delaware; Mr. Lanzi is a resident of Maryland.[24] Each one has a child who will be attending St. Mark's during the 1979–1980 academic year and participating in interscholastic athletics.[25] The plaintiffs stated in their affidavits that they chose to send their children to St. Mark's because it was a religious secondary educational institution and represented a vehicle through which they could direct the religious upbringing of their children.[26] Mrs. Valencia further averred that she wanted her children to learn that "the Catholic religion is not just something for Sundays, but is a way of life permeating all activity 24 hours a day."[27] She believes that St. Mark's conveys that concept to its students.

Both plaintiffs also have encouraged their children to participate in athletics at St. Mark's. They believe interscholastic athletics affords children an opportunity to learn important virtues such as discipline and obedience.[28] The inability of St. Mark's to schedule athletic events against schools in the Blue Hen Conference or to gain admission to the Conference, however, has created some problems for the plaintiffs and their children. They claim that the most serious consequence is the significant increase in the average distance that St. Mark's athletes must travel to away events. In the 1975–1976 school year, St. Mark's teams traveled a total of 1636 miles to away events or an average of 13.5 miles per event. During the 1978–1979 school year the total distance traveled was 2333 miles, an increase of roughly 43 percent. The average distance to an away event rose from 13.5 to 19.3 miles.[29] The plaintiffs contend the problem is especially pronounced with respect to football. They point out that St. Mark's football team traveled an average of 37.6 miles to their away games last season compared to one of the BHC schools, William Penn, which trav-

**20.** *Id.* par. 19, Exh. G; Docket Item 54 (Deposition of Earl R. Batten), Exh. B (Minutes of January 16, 1978 Meeting).

**21.** Docket Item 54, Exh. C (Minutes of February 13, 1978 Meeting).

**22.** Docket Item 61, pars. 21 & 22, Exhs. H & I.

**23.** *Id.* par. 25.

**24.** Docket Item 63 (Affidavit of Dorothy Valencia), par. 2; Docket Item 62 (Affidavit of Joseph G. Lanzi), par. 2.

**25.** Docket Item 30 (Affidavit of Don Warren Valencia); Docket Item 32 (Affidavit of John Anthony Lanzi); Docket Item 65 (Deposition of Dorothy Valencia), p. 3.

**26.** Docket Item 63, par. 3; Docket Item 62, par. 6.

**27.** Docket Item 63, par. 13.

**28.** *Id.* par. 14; Docket Item 62, par. 14.

**29.** Docket Item 34, Exh. B.

eled only 6.9 miles on the average.[30] It does not appear, however, that this imbalance can be completely attributed to the exclusion of St. Mark's from the Conference. During the 1978 season William Penn and most of the other BHC schools played only nine football games, while St. Mark's chose to play ten. St. Mark's had to travel 91.5 miles to play its most distant opponent. If it had foregone that game, St. Mark's football team would have traveled an average of only twenty miles to its away games and still would have played as many games as the BHC schools.[31]

In addition to the travel problem, the plaintiffs complain that the necessity of playing out-of-state opponents causes St. Mark's teams to receive less coverage in the local press than the public school teams and deprives them of the crowd following they might otherwise expect. Finally, the plaintiffs allege that their children have been frustrated and their morale weakened by their inability to compete with their peers in the New Castle County area.[32]

The Verified Complaint in this action consists of three counts. The first two allege infringement of the plaintiffs' right to the free exercise of their religion. It is alleged that the defendants' exclusion of St. Mark's from the Blue Hen Conference has caused the plaintiffs' children to travel farther and farther to athletic contests outside the State and thus subjected them to an increased risk of motor vehicle accidents. The plaintiffs claim that this increased risk and various other adverse effects of the defendants' actions are pressuring them to abandon their religious beliefs and send their children to public school. Count I asserts that the exclusion of St. Mark's violates the plaintiffs' First and Fourteenth Amendment rights, because it has the effect of impeding or infringing the free exercise of their right to transmit their religious faith to their children and is not justified by any compelling state interest.

In Count II the plaintiffs claim that the defendants' actions are unconstitutional because their purpose was to impede the observance of religion.

The third count of the complaint alleges that the defendants had no rational basis for refusing to admit St. Mark's to the Blue Hen Conference. Based on this allegation, the plaintiffs contend that their constitutional rights to equal protection and substantive due process have also been violated.[33]

In their answer, the defendants denied any wrongdoing and raised several affirmative defenses, including an argument that admitting St. Mark's into the Conference would violate the Establishment Clause of the First Amendment.[34] Against this background, the Court now turns to the merits of the plaintiffs' motion for a preliminary injunction.

## I. STANDARD FOR PRELIMINARY RELIEF

The power to issue a preliminary injunction, especially a mandatory one like

---

**30.** *Id.* Exhs. E. & P3.

**31.** *Id.*

**32.** Docket Item 62, pars. 20 & 21; Docket Item 63, par. 26.

**33.** The verified complaint focuses on the decision not to admit St. Mark's to the Blue Hen Conference. (Docket Item 1). In their brief and again at oral argument, the plaintiffs also averred that since 1975 the member schools of the BHC have "boycotted" athletic events against St. Mark's. The only relief requested in the motion for a preliminary injunction (Docket Item 6) is an order directing the Conference to admit St. Mark's as a member. Since that motion was made, however, the plaintiffs have suggested that as an alternative form of relief, the Court could order the defendants to provide St. Mark's with a number of games comparable to the number it had in 1975 with Blue Hen Conference schools.

The present record does not contain sufficient information to permit even a preliminary evaluation of the plaintiffs' boycott claim. Therefore, the Court will consider only the claims based on the decision to exclude St. Mark's from the Conference. Moreover, if the plaintiffs intend to pursue the boycott theory, they should amend the complaint to incorporate that claim.

**34.** Docket Items 10 and 15.

that requested here, should be sparingly exercised. *United States v. Spectro Foods Corp.*, 544 F.2d 1175, 1181 (C.A.3, 1976). The Third Circuit Court of Appeals recently summarized the standards for reviewing a motion for a preliminary injunction as follows:

". . . the moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured, *pendente lite* if relief is not granted. . . . Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court 'should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.' . . ."

While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements.

*Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (C.A.3, 1978) (citations and footnotes omitted); *see A. O. Smith Corp. v. FTC*, 530 F.2d 515, 525 (C.A.3, 1976).

In this case, the plaintiffs claim that their constitutional rights to the free exercise of religion and equal protection have been violated. The plaintiffs also allege that they will suffer irreparable harm if preliminary injunctive relief is not granted. The allegation of irreparable harm, however, is premised entirely on the proposition that persons who can establish that they are being denied their constitutional rights are entitled to preliminary injunctive relief. *See Elrod v. Burns*, 427 U.S. 347, 373, 96

S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (C.A.3, 1971). After carefully reviewing the record developed to date and the parties' thorough briefs on the merits, the Court concludes that the plaintiffs have not shown a reasonable probability of success on any of their claims for relief. Since the plaintiffs have failed to establish that their constitutional rights are being violated, their irreparable harm argument must be rejected as well. Thus, the Court finds that the requisite showings for relief *pendente lite* have not been made here, and the plaintiffs' motion for a preliminary injunction must be denied.[35]

The reasons for the Court's conclusion concerning the plaintiffs' probability of success on the merits are explained in detail below.[36]

## II. FREE EXERCISE CLAIMS

■ The First Amendment Religion Clauses provide:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . ..

These two clauses are referred to as the Establishment and Free Exercise Clauses, respectively, and have been made wholly applicable to the states by the Fourteenth Amendment. *Abington School District v. Schempp*, 374 U.S. 203, 215, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963); *Everson v. Board of Education*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947); *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). The Supreme Court has long recognized that the two clauses overlap and that "if expanded to a logical extreme, [either one] would trend to clash with the other." *Walz v. Tax Commission*, 397 U.S. 664, 668–

**35.** In light of the plaintiffs' failure to show either a likelihood of success on the merits or irreparable harm, it is unnecessary to discuss the other two factors relevant to a motion for temporary relief. It is noteworthy, however, that St. Mark's and the defendant Blue Hen Conference schools have already entered into contracts with their respective opponents for most of the interscholastic athletic events scheduled for the 1979–1980 school year. Consequently, the defendants would incur in-

creased administrative burdens if the Court were to enjoin them to play St. Mark's during the same time period and the contractual rights of some interested third parties might also be disrupted.

**36.** At oral argument plaintiffs' counsel expressed their preference for "a detailed ruling even at the expense of having to wait longer for the ruling." Docket Item 91, pp. 37–38.

69, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970). Both clauses, however, reflect the Government's firm commitment to a position of neutrality in the relationship between man and religion. *See Abington School District v. Schempp, supra,* 374 U.S. at 226, 83 S.Ct. 1560. In *Everson v. Board of Education, supra,* 330 U.S. at 18, 67 S.Ct. at 513 for example, the Court observed:

> [The First] Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary. State power is no more to be used so as to handicap religions than it is to favor them.

Accordingly,

> [e]ach value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so.

*Walz v. Tax Commission, supra,* 397 U.S. at 669, 90 S.Ct. at 1412.

In this case, the plaintiffs contend that the defendants' refusal to admit St. Mark's to the Blue Hen Conference violates their rights under the Free Exercise Clause. The principles governing a free exercise analysis were stated in *Gillette v. United States,* 401 U.S. 437, 462, 91 S.Ct. 828, 842, 28 L.Ed.2d 168 (1971) as follows:

> the Free Exercise Clause bars "governmental regulation of religious *beliefs* as such," *Sherbert v. Verner,* 374 U.S. 398, 402[, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965] (1963), or interference with the dissemination of religious ideas. See *Fowler v. Rhode Island,* 345 U.S. 67[, 73 S.Ct. 526, 97 L.Ed. 828] (1953); *Follett v. [Town of] McCormick,* 321 U.S. 573[, 64 S.Ct. 717, 88 L.Ed. 938] (1944); *Murdock v. Pennsylvania,* 319 U.S. 105[, 63 S.Ct. 870, 87 L.Ed. 1292] (1943). It prohibits misuse of secular governmental programs "to impede the observance of one or all religions or . . . to discriminate invidiously between religions, . . . even though the burden may be characterized as being

only indirect." *Braunfeld v. Brown,* 366 U.S. [599], at 607[, 81 S.Ct. 1144, at 1148, 6 L.Ed.2d 563] (opinion of Warren, C. J.). And even as to neutral prohibitory or regulatory laws having secular aims, the Free Exercise Clause may condemn certain applications clashing with imperatives of religion and conscience, when the burden on First Amendment values is not justifiable in terms of the Government's valid aims.

*Quoted in Johnson v. Robison,* 415 U.S. 361, 384, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). The decision not to admit St. Mark's to the BHC does not directly regulate religious beliefs as such or interfere with the dissemination of religious ideas. Hence, the first line of cases mentioned in *Gillette* is inapposite. The two latter principles do apply, however, because the plaintiffs challenge the defendants' action on the grounds that it was intended to interfere with the practice of their religion or, alternatively, that it had the effect of doing so and cannot be justified in terms of the State's valid aims.

### A. *Impermissible Purpose Claim*

 The first of these arguments can be easily disposed of because the record simply does not support the plaintiffs' allegation of an impermissible purpose. The only direct evidence that the decision to exclude St. Mark's may have been influenced by religious considerations is a statement by one of the defendants, William A. Cole, to the effect that anything that binds a group of students together, such as belonging to the same religion, gives them an advantage in competitive athletics over students in a typical public school. Mr. Cole stated that this cohesiveness or unity was one of several factors which made private schools, like St. Mark's, fundamentally different from public schools and led him to conclude that the BHC constitution should not be changed to make private schools eligible for membership.[37] The Court is by no means convinced that such reasoning reflects an intent to interfere with the practice of religion, but even if it were, the plaintiffs still would not

---

**37.** Docket Item 47, pp. 34–38.

have shown that the challenged action was motivated by an improper purpose. Mr. Cole was only one of thirteen people who voted not to amend the constitution.[38] Thus, the possibility that Mr. Cole may have been motivated by an impermissible reason would not in itself warrant holding the challenged action invalid.

Mr. Russo, the principal of St. Mark's, has alleged that, prior to the January 16, 1978 Conference meeting, he met with the defendant Plitnik to discuss the admission of St. Mark's and was told that if the BHC schools refused to play St. Mark's in athletics, local students would think twice about going there.[39] The plaintiffs also point out that the defendant Klimek acknowledged that some students would be deterred from attending St. Mark's by the fact that it did not belong to the BHC.[40] Both Mr. Plitnik and Mr. Klimek have categorically denied that their decision not to amend the Conference constitution was motivated by any intent to deter children from attending St. Mark's.[41] Resolution of these and other factual disputes must await trial.

■ The plaintiffs attempt to circumvent the defendants' denials of improper motive by arguing that proof that the challenged action was taken with knowledge that it would impede the practice of religion is sufficient, in itself, to establish a violation of the "purpose" guarantee of the Religion Clauses. The Court disagrees. Evidence that a defendant knew his actions would have an adverse impact upon the practice of religion might support an inference that the adverse effects were desired, but it alone does not prove that fact. In order to establish the existence of a constitutionally impermissible motive, the plaintiffs must prove more than an awareness of consequences; they must prove that the defendants "selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of' its adverse effects upon the practice of religion." *See Personnel Administrator v. Feeney,* —— U.S. ——, 99 S.Ct. 2282, 60 L.Ed.2d 870, (1979); *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

■ All the other evidence cited by the plaintiffs in an attempt to show an improper purpose is circumstantial in nature and susceptible to a nonreligious or neutral explanation. For example, the plaintiffs refer to the fact that five Catholic schools have been denied admission to the Blue Hen Conference. There is no evidence, however, that any other private school has ever applied for admission to the Conference. Thus, the rejection of the five Catholic schools may simply reflect the Conference's long-standing policy of excluding all private schools from membership, regardless of their religious affiliation. The plaintiffs also charge that the defendants have been swayed by rumors of recruiting and unfounded fears that St. Mark's would have an unfair competitive advantage over them and have ignored Mr. Russo's protestations to the contrary. Even if these allegations were true, they would indicate only a difference of opinion and not an intent to impede the practice of religion. It is also noteworthy that the defendants' fears of a competitive imbalance have some factual basis, at least with respect to football, in that St. Mark's and another Catholic high school, Salesianum, have traditionally had a

---

**38.** Docket Item 54, Exh. C. At least one other defendant also relied on what he called fundamental differences between the public schools and St. Mark's. Docket Item 51 (Deposition of Carmen P. Leto), pp. 6, 10, and 19. It is clear from the context of Mr. Leto's statements, however, that he was referring to differences between private schools in general and public schools. He stressed the differences between the two types of schools in terms of admissions policies, tuition and attendance boundaries. Nothing that Mr. Leto said during his deposition suggests that he based his decision on religious considerations.

**39.** Docket Item 61, par. 15.

**40.** Docket Item 50 (Deposition of Kenneth E. Klimek), p. 42.

**41.** Docket Item 73 (Affidavit of George J. Plitnik), par. 8; Docket Item 50, pp. 42–44.

large measure of success against BHC schools in that sport.[42]

In sum, after carefully reviewing all the evidence in the record, the Court finds that the plaintiffs have not shown a reasonable probability of success on the merits of their impermissible purpose claim.

## B. *Adverse Effects on Practice of Religion*

The plaintiffs' other claim under the Free Exercise Clause does not depend upon proof of a purpose to interfere with religion; they contend that even neutral governmental activity which indirectly impedes religious practice falls within the proscription of that Clause. Specifically, plaintiffs argue that preclusion of St. Mark's from membership in the Blue Hen Conference has the effect of making it more difficult and dangerous for their children, relative to public school children, to participate in interscholastic athletics. This, plaintiffs conclude, penalizes or exacts a price for exercise of their constitutional right to send their children to Catholic schools.

■ The principle upon which the plaintiffs rely was enunciated in *Sherbert v. Verner, supra,* in which the Court held that South Carolina could not deny unemployment compensation benefits to a woman solely because she refused, based on her fundamental religious conviction, to work on Saturday, her Sabbath. The teaching of *Sherbert* is that a regulation neutral on its face may, in its application, nonetheless offend the constitutional requirement of neutrality toward religion if it unduly burdens the free exercise of religion. *Wisconsin v.*

*Yoder,* 406 U.S. 205, 220, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). The decision of the defendants in this case to retain the provision of their constitution limiting membership to public schools is facially neutral in terms of religion. Under the standard announced in *Sherbert* the defendants' action can withstand the plaintiffs' constitutional challenge, if it appears either that the exclusion of St. Mark's from the BHC "represents no infringement by the State of [the plaintiffs'] constitutional rights of free exercise," or that "any incidental burden on the free exercise of [plaintiffs'] religion may be justified by a 'compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . .'" 374 U.S. at 403, 83 S.Ct. at 1793, *quoting NAACP v. Button,* 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

■ Turning first to the question whether the defendants' actions impose any burden on the free exercise of plaintiffs' religion, this Court will begin by examining the nature of the interest allegedly infringed. It is by now well established that parents have a constitutionally protected interest in directing the rearing and religious upbringing of their children, including their education in church-operated schools. *Wisconsin v. Yoder, supra,* 406 U.S. at 213–14, 92 S.Ct. 1526; *Pierce v. Society of Sisters,* 268 U.S. 510, 534–35, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). The record in this case indicates that Catholic parents have a duty to send their children to Catholic schools, when and where it is possible.[43] One of the goals of

---

**42.** Since the academic year 1972–1973, when St. Mark's had its first graduating class, it has won 22 and lost 3 football games against BHC schools. Docket Item 83A (Exhibits to Deposition of Donald V. Burawski), Exh. NCCSD No. 20. For evidence of similar domination by Salesianum, see Docket Item 72 (Affidavit of James Atkinson), par. 5; Docket Item 71 (Affidavit of Wayne Von Stetten), par. 5.

**43.** Docket Item 66, Exh. NCCSD 13 (Pastoral Letter entitled "To Teach as Jesus Did"), pp. 359–60; *Id.,* Exh. NCCSD 14 (*Declaration on Christian Education* issued as a Document of Vatican Council II), part 8. It is not mandatory, however, that Catholic parents send their

children to Catholic schools. Father Cini testified that any "serious reason" would justify not sending a child to Catholic school. Docket Item 66, pp. 14–15. Plaintiff Lanzi, for example, did not send his children to a Catholic grade school at one point, because he thought the classes there were overcrowded. Docket Item 45 (Deposition of Dr. Joseph G. Lanzi), p. 5. Thus, the duty to send one's children to Catholic schools does not appear to be a "cardinal principle" or "fundamental tenet" of the Catholic faith as those terms were used in *Sherbert v. Verner, supra,* 374 U.S. at 406, 83 S.Ct. 1790, and *Wisconsin v. Yoder, supra,* 406 U.S. at 218, 92 S.Ct. 1526.

the Catholic educational system is to integrate religious truth and values with all aspects of daily life. In the words of the Second Vatican Council: [44]

> It strives to relate all human culture eventually to the news of salvation, so that the light of faith will illumine the knowledge which students gradually gain of the world, of life, and of mankind.

The Catholic religion, like most religions, also expects parents to work with the Church to achieve the harmonious development of their children's physical, moral and intellectual endowments. And it is undisputed that interscholastic athletics at the high school level can be an important means for reaching that goal. The plaintiffs contend that their efforts to fulfill their obligation to educate their children in a Catholic school in a manner which fosters the integrated development of all aspects of the child's life, including the physical aspect, have been burdened by the defendants' refusal to change the Blue Hen Conference constitution to permit St. Mark's to become a member. In particular, they allege that the defendants' action has caused students who participate in interscholastic athletics at St. Mark's to travel farther to away events and thus to encounter a greater risk of travel-related accidents, to endure more inconvenience generally, and finally, to enjoy fewer benefits in terms of local press coverage and crowd support than similar students in the Conference schools. Accepting these allegations as true, the Court must now determine whether those consequences infringe the plaintiffs' constitutional rights to the free exercise of their religion.

At the outset, the Court notes that the decision challenged here does not require the plaintiffs or the class they desire to represent to make any choice comparable to that required of the petitioners in the two cases upon which they principally rely, *Sherbert v. Verner, supra,* and *Wisconsin v. Yoder, supra.* In *Sherbert* the Supreme Court described the burden imposed by the State's denial of unemployment compensa-

tion benefits to a Seventh-Day Adventist who refused to work on Saturday as follows:

> Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Id.* 374 U.S. at 404, 83 S.Ct. at 1794.

The regulation at issue in *Wisconsin v. Yoder, supra,* imposed a direct burden on the practice of religion that was at least as onerous as the one proscribed in *Sherbert.* In that case two members of the Amish religion challenged their convictions for violating a Wisconsin statute which required parents to sent their children to school until age 16. The petitioners declined to send their children to school after they completed the eighth grade, because formal high school education beyond that point is contrary to fundamental Amish beliefs. 406 U.S. at 208–09, 211, 92 S.Ct. 1526. The Supreme Court held the convictions unconstitutional under the Free Exercise Clause and ordered the State to create an exemption to its compulsory education law for the Amish. Concerning the burden imposed upon the petitioners' free exercise rights, the Court stated:

> The impact of the compulsory-attendance law on respondents' practice of the Amish religion is not only severe but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to perform acts undeniably at odds with fundamental tenets of their religious beliefs. See *Braunfeld v. Brown,* 366 U.S. 599, 605[, 81 S.Ct. 1144, 6 L.Ed.2d 563] (1961). Nor is the impact of

---

44. Docket Item 66, Exh. NCCSD 14, p. 646 (footnote omitted).

the compulsory-attendance law confined to grave interference with important Amish religious tenets from a subjective point of view. It carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent. As the record shows, compulsory school attendance to age 16 for Amish children carries with it a very real threat of undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region. 406 U.S. at 218, 92 S.Ct. at 1534–35 (footnote omitted).

■ The burden complained of in this case pales in comparison. The plaintiffs contend that the exclusion of St. Mark's from the BHC confronts them with three choices: (1) to continue to allow their children to participate in interscholastic athletics at St. Mark's and thus subject them to an increasing amount of travel and its attendant risks; (2) to have their children abandon interscholastic athletics; or (3) to place their children in a public school where, presumably, participation in interscholastic athletics would subject them to less danger of injury. It does not appear from the record, however, that either of the plaintiffs has seriously considered removing his child from St. Mark's because of the distance they must travel to compete in interscholastic athletic events.[45] Nor had Mr. Russo ever heard of a student's withdrawing from St. Mark's for that reason.[46] In light of the minimal degree of the burden imposed on the plaintiffs and the remoteness of it to the exercise of their religion, the Court seriously doubts that the defendants' actions infringe upon any rights protected by the Free Exercise Clause.

■ A claim "must be rooted in religious belief" to have the protection of the Religion Clauses. *Wisconsin v. Yoder, supra,* 406 U.S. at 215, 92 S.Ct. 1526. The plaintiffs have shown that their religion requires them to send their children to Catholic schools, when possible, and to attempt to imbue all aspects of their development, physical as well as mental, with the teachings of their faith. There has been no showing, however, that interscholastic athletics represents the only means for fulfilling the latter duty. Intramural athletics and other forms of extracurricular activities could serve the same ends. More importantly, the record shows that St. Mark's has a very extensive program in interscholastic athletics; it plays a full schedule of events in fourteen different sports.[47] In only two sports, football and wrestling, did the average distance traveled to an away event during 1978–1979 exceed twenty-five miles. In both those instances, however, St. Mark's could have reduced the average distance to less than 25 miles per game by eliminating the most distant event.[48] Thus, there are means available to St. Mark's and the plaintiffs to alleviate the burdens complained of here that do not create any conflicts with the precepts of the Catholic religion. Of course, St. Mark's teams might still have to travel slightly farther on the average than the BHC teams, but that fact alone does not strike the Court as being constitutionally significant. While there may be a point at which the discrepancy becomes so great as to burden a person's free exercise rights, that limit has not been reached in this case.[49]

45. Docket Item 45, pp. 15–16; Docket Item 65 (Deposition of Dorothy Valencia), p. 40.

46. Docket Item 61, pp. 12–13.

47. Docket Item 61, Exh. A.

48. Docket Item 34.

49. The only case cited by the plaintiffs which arguably supports a contrary conclusion is *Keegan v. University of Delaware,* 349 A.2d 14 (Del.Sup.1975), *cert. denied,* 424 U.S. 934, 96 S.Ct. 1148, 47 L.Ed.2d 342 (1976). In *Keegan* the Delaware Supreme Court struck down a University policy prohibiting religious worship services in the commons areas of student dormitories. The court rejected the University's argument that the burden on the students' right to freely exercise their religion did not rise to a constitutional dimension, holding that both the purpose and effect of the regulation were to impede the observance of religion. 349 A.2d at

By describing their burden in terms of the distances St. Mark's must travel compared to BHC schools, the plaintiffs are treating membership in the Blue Hen Conference as a benefit. That is, member schools are effectively guaranteed a full schedule of interscholastic athletic events against schools in New Castle County, if they want it. The gist of the plaintiffs' First Amendment argument is that the defendants, having decided to extend to interested public schools the benefits of Conference membership, *must* extend that benefit to parochial and private schools as well. For present purposes the Court will assume that it would have been constitutionally permissible for the defendants to admit St. Mark's to the BHC,[50] the question here, however, is whether the Constitution mandates admission of St. Mark's. The pertinent caselaw clearly indicates that it does not.

In *Everson v. Board of Education, supra,* the Court upheld, against an Establishment Clause challenge, a school board resolution, pursuant to a New Jersey statute, authorizing reimbursement from public funds of fares paid by parents for the transportation of their children to either public or parochial schools. The Court there observed:

> New Jersey cannot consistently with the "establishment of religion" clause of the First Amendment contribute tax-raised funds to the support of an institution which teaches the tenets and faith of any church. On the other hand, other language of the amendment commands that New Jersey cannot hamper its citizens in

the free exercise of their own religion. Consequently, it cannot exclude individual Catholics, . . . or the members of any other faith, *because of their faith, or lack of it,* from receiving the benefits of public welfare legislation. *While we do not mean to intimate that a state could not provide transportation only to children attending public schools,* we must be careful, in protecting the citizens of New Jersey against state-established churches, to be sure that we do not inadvertently prohibit New Jersey from extending its general state law benefits to all its citizens without regard to their religious belief.

330 U.S. at 16, 67 S.Ct. at 512 (emphasis supplied); *cf. Norwood v. Harrison,* 413 U.S. 455, 461–63, 93 S.Ct. 2804, 2809, 37 L.Ed.2d 723 (1973) (Equal Protection Clause does not require states to "provide assistance to private schools equivalent to that which it provides to public schools").

The distinction between aid that is permissible and that which is mandated was drawn with precision in *Brusca v. State ex rel. State Board of Education,* 332 F.Supp. 275 (E.D.Mo.1971) (three-judge court), *aff'd mem.,* 405 U.S. 1050, 92 S.Ct. 1493, 31 L.Ed.2d 786 (1972). That case involved a challenge by parents whose children attended parochial school to Missouri constitutional and statutory provisions which established a free public school system and prohibited the use of public funds to aid directly or indirectly religious schools. The only First Amendment issue before the court in *Brusca* was "whether the enactment of

16–19. The regulation in the case *sub judice,* however, is distinguishable from the one invalidated in *Keegan* on at least two grounds. First, the only activity proscribed by the regulation in *Keegan* was worship. The regulation had the effect of preventing adult students from engaging in religious worship—"historically a communal exercise"—in a common area of a University dormitory which was provided for student use and in which the University permitted every other student activity. *Id.* at 17–18. Thus, the burden in *Keegan* was more closely related to fundamental religious tenets and practice than the burden alleged here. Second, unlike the rule limiting BHC membership to

public schools, the University's ban on worship in the commons areas was found to have the purpose of impeding religion. *Id.* at 19.

**50.** The plaintiffs recognize that the Establishment Clause may limit the authority of the State to confer benefits upon religiously-oriented schools, but contend its has no application in the instant circumstances. The defendants have raised the spectre of the Establishment Clause as an affirmative defense. Given the Court's resolution of the other issues raised by the motion for preliminary injunction, it is unnecessary to address the Establishment Clause issues at this time.

some program designed to assist a parent in educating his child religiously with the use of tax-raised money is *mandated* by the [Free Exercise Clause]." 332 F.Supp. at 279 (emphasis in original). The court answered in the negative. *Id.*; *accord, Jackson v. State*, 460 F.2d 282 (C.A.9, 1972) (per curiam).

In 1974 the Supreme Court affirmed without opinion the decision of a three-judge court upholding a Missouri statute providing bus transportation to school for public school children, but not for parochial or private school children, living specified distances from their schools. *Luetkemeyer v. Kaufmann*, 419 U.S. 888, 95 S.Ct. 167, 42 L.Ed.2d 134 (1974), *aff'g*, 364 F.Supp. 376 (W.D.Mo.1973). That decision, together with those previously mentioned, makes clear that while the State *may*, without violating the Establishment Clause, provide some secular benefits which incidentally relieve the burdens assumed by parents who choose to send their children to parochial schools, it is not required to do so by the Free Exercise Clause.

Finally, even if the Court assumes that the limitation of membership in the BHC to public schools burdens the plaintiffs' free exercise rights, that burden seems justifiable in terms of the defendants' valid aims. Where a Government rule or regulation interferes with the practice of religion, *Sherbert v. Verner, supra*, requires the courts to engage in an *ad hoc* balancing of the Government's interest and the affected free exercise interest. To justify the burden imposed the Government must show that the regulation is designed to serve a substantial interest and that no alternative forms of regulation would serve that interest without infringing First Amendment rights. *Johnson v. Robison, supra*, 415 U.S. at 384–86, 94 S.Ct. 1160; *Wisconsin v. Yoder, supra*, 406 U.S. at 214, 219–29, 92 S.Ct. 1526; *Gillette v. United States, supra*, 401 U.S. at 461, 91 S.Ct. 828; *Sherbert v. Verner, supra*, 374 U.S. at 406–07, 83 S.Ct. 1790. As in most balancing contexts, the surest gauge of the reach of the general principle is a review of how it has been applied in particular factual settings.

The only cases in which the Supreme Court has invalidated neutral governmental regulations based on their adverse impact on free exercise rights are *Sherbert v. Verner, supra*, and *Wisconsin v. Yoder, supra.* As noted earlier, the petitioners in those cases suffered substantial infringements of their rights to follow certain fundamental tenets of their respective religions. Moreover, in both cases the State failed to identify any legitimate interest furthered by the challenged regulation that could not have been effectively served by means less intrusive on First Amendment interests.

On the other hand, the Court held in *Braunfeld v. Brown*, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1966), that a state may require Orthodox Jews to close their businesses on Sunday even though they observed the Sabbath on Saturday. In *Braunfeld* the significant burden imposed on Orthodox Jews by the Sunday closing laws was found to be outweighed by "a strong state interest in providing one uniform day of rest for all workers," which could not be realized by any less intrusive alternative means. *Sherbert v. Verner, supra*, 374 U.S. at 408, 83 S.Ct. 1790. Similarly, the Court has rejected a challenge to a federal statute requiring a person whose religious beliefs cause him to object conscientiously to a particular war to abandon his beliefs and participate in that war or go to jail. *Gillette v. United States, supra.* In *Gillette* the Court found the Government's substantial interest in raising and supporting armies to be of "a kind and weight sufficient to justify under the Free Exercise Clause the impact of the conscription laws on those who object to particular wars." 401 U.S. at 461, 91 S.Ct. at 842. Later, in *Johnson v. Robison*, 415 U.S. 361, 383–86, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), the Court held that the same Government interest *a fortiori* was sufficient to sustain a statute denying veterans' educational benefits to conscientious objectors who performed alternative service for two years as required by the conscription laws. The following comment in *Johnson v. Robison* is especially pertinent here:

[T]he burden upon appellee's free exercise of religion—the denial of the economic value of veterans' educational benefits under the Act—is not nearly of the same order or magnitude as the infringement upon free exercise of religion suffered by petitioners in *Gillette*.

415 U.S. at 385–86, 94 S.Ct. at 1175 (citation omitted). That statement clearly implies that the severity of the burden on free exercise rights is an important factor to be considered in the *ad hoc* balancing process.

The impact, if any, of the defendants' decision not to amend the Blue Hen Conference constitution to admit St. Mark's on the free exercise of religion is minimal. Both plaintiffs seem committed to keeping their children in St. Mark's despite the adverse effects of the school's exclusion from the BHC. Furthermore, it does not appear that the defendants' actions have increased to any significant degree the burdens flowing from the plaintiffs' decision to send their children to a Catholic school.

On the other side of the scale, the record shows that the defendants have a legitimate interest in preventing recruiting and maintaining a competitive balance with the BHC. Indeed, the interests advanced in this case are nearly identical to those which the court in *Walsh v. Louisiana High School Athletic Association*, 428 F.Supp. 1261, 1266 (E.D.La.1977), found sufficient to justify a transfer rule that rendered all ninth graders at a Lutheran high school ineligible to participate in interscholastic athletics. In *Walsh*, as in this case, all parties agreed that recruiting of school children by overzealous athletic coaches, fans, and school faculty was an evil to be prevented. 428 F.Supp. at 1264. The defendants in *Walsh* argued that athletic eligibility and transfer rules based on narrow geographic attendance areas were the only feasible means for preventing recruiting. The defendants in this case contend that one of the principal reasons for excluding private schools from the BHC is the fact that they may draw students from geographic areas that are much broader than, and overlap with, the attendance zones of the BHC schools. The larger attendance zones of the private schools allegedly make enforcement of the recruiting rules almost impossible.

The defendants also fear that differences between private and public schools in terms of tuition charges and admission standards may tend to give private schools an unfair competitive advantage over public schools in athletics. The plaintiffs contend these fears are baseless and perhaps they are. There is no evidence, however, that the defendants' fears are not genuine. The performance of St. Mark's and a similar school, Salesianum, in football lends at least some credence to the defendants' concern about a competitive imbalance.

Thus, the Blue Hen Conference appears to have legitimate interests in limiting its membership to public schools. Whether those interests could be served by some less intrusive means has been vigorously disputed, but that issue cannot be resolved on the present record. The mere possibility of a less intrusive alternative, however, does not mean that the plaintiffs are likely to succeed on their claim that the defendants' actions unduly burden their First Amendment rights. To the contrary, the minimal degree of the burden upon the practice of religion in this case and the fact that it is incidental to a general regulation which serves legitimate secular ends lead the Court to conclude that any burden imposed is probably justified.

## III. EQUAL PROTECTION CLAIM

■ The third count of the complaint alleges that the provision of the Blue Hen Conference constitution limiting membership to public schools violates the plaintiffs' rights under the Equal Protection Clause.[51]

---

**51.** The plaintiffs also allege that the defendants' actions were arbitrary and thus violated their rights to substantive due process. The evidence in the record clearly shows that the defendants decided not to change their constitution to permit private schools to become members primarily because they believed that the lack of attendance areas for private schools increased the possibility of recruiting and, along with other things, gave such schools a

The right allegedly infringed here is the right of private and parochial school students to be treated similarly to public school students with regard to participation in interscholastic athletics. The same right was allegedly abridged in *Denis J. O'Connell High School v. Virginia High School League*, 581 F.2d 81, 84 (C.A.4, 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), in which a Catholic high school was denied admission to a state-wide athletic league solely on the ground that it was a private school. The *O'Connell* court described the applicable standard of review as follows:

> Where, as here, there is no fundamental right or suspect classification involved, the test to determine the validity of state legislation is whether the statutory classification bears some rational relationship to a legitimate state purpose. *San Antonio Independent School District v. Rodriguez, supra*, 411 U.S. [1,] 17, 93 S.Ct. 1278 [, 36 L.Ed.2d 16 (1973)] . . . Furthermore, "State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." *McGowan v. Maryland* (1961), 366 U.S. 420, 425–426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393.

▪ In the preceding section, this Court concluded that the provision of the BHC constitution excluding private schools is supported by legitimate State interests, namely, the prevention of recruiting and the maintenance of a competitive balance. The Court further finds that the classification drawn between public and private schools is rationally related to those inter-

ests, because private schools, unlike public schools, do not have defined attendance areas.[52] In *Denis J. O'Connell High School v. Virginia High School League, supra*, 581 F.2d at 87–88, the Court of Appeals for the Fourth Circuit held that a similar classification based on essentially the same reasons was rationally related to a legitimate State objective. The *O'Connell* court upheld the classification despite the absence of any evidence showing that the private schools actually had recruited. The court also noted that whether or not the classification was the best way to accomplish the State's objective was "inconsequential" under the Equal Protection Clause. 581 F.2d at 87. On the present record in the instant case, this Court considers *O'Connell* controlling and thus concludes that the plaintiffs have failed to establish a likelihood of success on their equal protection claim.

▪ The plaintiffs' attempt to distinguish *O'Connell* on the ground that the State legislature created the classification at issue there is unpersuasive. Although the Delaware State Board of Education authorizes the formation of conferences composed of both public and private schools, it does not prohibit conferences which are limited to public schools. In fact, the State Board of Education specifically approved the defendants' decision not to amend BHC's constitution to make St. Mark's eligible for membership. Likewise, the resolution recently passed by the Delaware House of Representatives,[53] directing each public school conference to schedule and to play non-public schools in the same geographic area in all sports where both schools have teams, demonstrates only that the wisdom of the defendants' actions is subject to question, not that it is necessarily irrational. Since the Equal Protection Clause does not

competitive advantage over public schools. Finding those reasons rational, the Court concludes the plaintiffs are not likely to succeed on the merits of their substantive due process claim.

**52.** The two public schools in the BHC which have county-wide attendance areas—Howard Career Center and Delcastle Vocational-Technical High School—provide limited and specializ-

ed educational programs and thus are distinguishable from St. Mark's. Neither of those schools has ever dominated its BHC opponents. *See* Docket Item 71, par. 6; Docket Item 73, par. 7.

**53.** House Joint Resolution No. 14, passed June 27, 1979. The resolution is presently pending before the Delaware Senate.

provide a refuge from ill-advised laws, the plaintiffs must make a stronger showing than they have thus far to prevail on Count III. *See Personnel Administrator v. Feeney, supra,* --- U.S. at ---- , 99 S.Ct. 2282.

 The plaintiffs' other argument that the defendants never expressed any reason for their rejection of St. Mark's application in 1978, other than their desire not to change the Conference constitution, misses the point. To withstand an equal protection challenge a classification must be supported by a rational basis; there is no requirement, however, that the basis be expressly stated. The record amply demonstrates that most of the reasons asserted by the defendants in this suit for their actions were held by them at the time the decision was made not to change the constitution. Several of the defendants expressed their concerns about recruiting, possible domination and St. Mark's lack of an attendance area to Mr. Russo in late 1977.[54] Mr. Russo addressed those and other questions when he presented St. Mark's application for membership at the January 16, 1978 Conference meeting.[55] Therefore, the record belies the plaintiffs' allegation that the defendants had no reason for denying St. Mark's application.

 In summary, the plaintiffs have challenged the decision of the BHC to continue to exclude all private schools, and thus St. Mark's, from membership on three grounds: (1) that it was motivated by an impermissible purpose; (2) that it unduly burdens the free exercise of religion; and (3) that it draws a classification which is not rationally related to any legitimate state end. The evidence thus far does not support the first ground. The second argument is not convincing as a matter of law, because it attempts to extend the principles enunciated in *Sherbert v. Verner, supra,* and *Wisconsin v. Yoder, supra,* beyond the point where a sensible and realistic application of the Religion Clauses would take

them. Finally, the plaintiffs have failed to show a sufficient likelihood of success on their third or equal protection argument to warrant the issuance of a preliminary injunction.

---

**54.** Docket Item 67, p. 114; Docket Item 61, par. 16.

**55.** Docket Item 54, Exh. B.