SNYDER v CHARLOTTE PUBLIC SCHOOL DISTRICT

Docket No. 60659. Submitted June 16, 1982, at Lansing.—Decided February 8, 1983. Leave to appeal granted, 417 Mich 1041.

Brenda Snyder is a student at Charlotte Christian Academy. Because that school did not offer a band program Brenda's parents, David and Patricia Snyder, attempted to enroll her in the band course offered by Charlotte Junior High School. She was refused because of the Charlotte Public School District's policy of allowing attendance in its schools of only full-time students. The Snyders brought an action against the school district seeking an injunction which would require the district to admit Brenda to the band class. The Eaton Circuit Court, Richard Robinson, J., held that plaintiffs had no cause of action and dismissed the complaint. Plaintiffs appeal. On appeal, the Attorney General has intervened as an appellant. Plaintiffs contend that the school district's policy violates the First and Fourteenth Amendments to the United States Constitution and is contrary to statute. *Held:*

1. A school district is not required to offer shared-time instruction. However, once it has elected to do so it must provide the instruction without regard to the religious or personal convictions of the individual student. The school district in this case permissibly elected not to make its courses available to any but full-time students.

2. The district's policy does not violate either the guarantee of the free exercise of religion or the guarantee of equal protection of the law. The reasons advanced by the district for adoption of the policy are reasonably related to the operation of a public school district. Furthermore, the adoption of plaintiffs'

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 10] 68 Am Jur 2d, Schools § 304.5.

[3, 8, 9] 68 Am Jur 2d, Schools § 215.

[4, 5] 68 Am Jur 2d, Schools § 283.

[6] 46 Am Jur 2d, Judges § 220.

[7, 11] 16A Am Jur 2d, Constitutional Law §§ 471, 473.

Supreme Court cases involving establishment and freedom of religion clauses of Federal Constitution. 37 L Ed 2d 1147.

[8, 9] 68 Am Jur 2d, Schools § 290.

position would provide the potential for excessive "entanglement" between the public school district and the exercise of religion.

3. The school district is empowered to offer those courses of study which it deems necessary or desirable, including certain auxiliary services such as health services and remedial education. Band instruction is not such an auxiliary service.

4. Plaintiffs failed to support their claim of bias on the part of the trial judge.

Affirmed.

T. M. BURNS, J., dissented. He would hold that, despite the fact that the school district's policy appears neutral on its face, its effect is that it impermissibly' discriminates against the plaintiffs who are acting according to the dictates of their religious beliefs in sending Brenda to a nonpublic school. The policy violates the plaintiffs' rights to freely exercise their religious beliefs by conditioning the right to enroll Brenda in the band on the choice of foregoing the right to enroll her in a parochial school. The reasons advanced by the district are not sufficient to justify the burden on the exercise of the plaintiffs' rights. Judge BURNS would reverse and order the entry of an appropriate injunction.

## OPINION OF THE COURT

1. SCHOOLS — SHARED TIME.

A local school district may permissibly decline to offer any shared time instruction, in which the public school district makes available courses in its general curriculum to both public and nonpublic school students; however, once a district chooses to offer such instruction, participation may not depend upon the particular religious or personal convictions of the individual student.

2. SCHOOLS — SHARED TIME — EQUAL PROTECTION.

The proper standard of review to determine whether a school district's decision not to offer shared time instruction violates equal protection is the "rational relationship" standard, not the "compelling state interest" standard.

3. SCHOOLS — RELIGION.

A local school district's policy of enrolling only full-time students in its courses does not deny a private school student the free exercise of religion where, because of the district policy, that student is not permitted to attend a class in the public school.

4. SCHOOLS — SCHOOL DISTRICT POLICY — ABUSE OF DISCRETION.

Review of a school board's decisions in providing the courses of study it deems necessary or desirable utilizes the standard of "arbitrary and capricious" or "abuse of discretion" appropriate to administrative bodies; in such a review, the presumption is in favor of the reasonableness and propriety of the board's actions.

5. SCHOOLS — AUXILIARY SERVICES — BAND INSTRUCTION.

Band instruction is not an "auxiliary service" which may be provided by a school district to all residents of the district pursuant to statutory authority and administrative rule (MCL 380.1296; MSA 15.41296; 1979 AC, R 340.292).

6. JUDGES — PRESUMPTION OF IMPARTIALITY.

A trial judge is presumed to be fair and impartial and a litigant challenging this presumption has a heavy burden of proof.

DISSENT BY T. M. BURNS, J.

7. CONSTITUTIONAL LAW — FREEDOM OF RELIGION — COMPELLING STATE INTEREST.

*The right to freely exercise one's religious beliefs is a fundamental interest; a categorization which infringes upon that right may be upheld only upon a showing of a compelling state interest.*

8. SCHOOLS — RELIGION — NEUTRAL RULES.

*Application of a neutral rule which results in religious discrimination is not permissible; a school district's policy of allowing only full-time students to participate in its courses of instruction, while neutral on its face, discriminates against a student who attends a private school because of her religious beliefs and who wishes to attend a class in the public school which is not offered in the private school.*

9. SCHOOLS — RELIGION.

*A school district's responsibility to the residents of the district is to be neutral in the face of religious differences.*

10. SCHOOLS — SHARED TIME — AUXILIARY SERVICES.

*"Shared time" is a method of using school resources, which cannot be equated with nonmandatory auxiliary services such as health care and remedial education.*

11. CONSTITUTIONAL LAW — FREEDOM OF RELIGION.

*The free exercise of religion clause of the United States Constitu-*

*tion must prevail over the establishment of religion clause where the two conflict (US Const, Am I).*

*Kenneth L. Swarthout,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Gerald F. Young* and *Paul J. Zimmer,* Assistants Attorney General, for intervening appellant.

*Thrun, Maatsch & Nordberg, P.C.* (by *Thomas J. Nordberg* and *Michael A. Eschelbach*), for defendant.

Amici Curiae:

Michigan Association of Nonpublic Schools (by *Stuart D. Hubbell*).

Michigan Education Association (by *Levin, Levin, Garvett & Dill,* by *Erwin B. Ellmann*).

Michigan Association of School Boards (by *Linda L. Bruin*).

Before: D. E. HOLBROOK, JR., P.J., and T. M. BURNS and J. E. McDONALD,* JJ.

J. E. McDONALD, J. Plaintiffs David and Patricia Snyder, and their minor daughter, plaintiff Brenda Snyder, reside in Eaton County, Michigan, where Brenda is enrolled in the sixth grade at the Charlotte Christian Academy. In 1981, Patricia Snyder attempted to enroll Brenda in the band course offered by the Charlotte Junior High School. The principal of the school refused to admit Brenda for

---

* Circuit judge, sitting on the Court of Appeals by assignment. The majority opinion as written by J. E. McDONALD, J., was approved by D. E. HOLBROOK, JR., P.J., prior to the death of Judge McDONALD. The opinion was not filed and released, however, until February 8, 1983.

band instruction because of the school district's policy of allowing attendance in its schools of only full-time students.

Thereafter, on September 8, 1981, plaintiffs filed suit in the Eaton County Circuit Court seeking an injunction requiring defendant Charlotte Public School District to admit Brenda to the band class. Following a bench trial held on September 25, 1981, a final judgment of no cause of action and dismissal of plaintiffs' complaint was rendered by the trial judge. Plaintiffs appeal as of right. The Attorney General of the State of Michigan has intervened as an appellant, and various parties have filed as amici curiae.

On appeal, plaintiffs contend that defendant school district's policy of denying admission to its courses violates the First and Fourteenth Amendments to the United States Constitution and, further, that the school board is acting without statutory authority. After careful analysis of plaintiffs' arguments, we disagree and affirm the judgment of the trial court.

## I. Constitutional Considerations

Plaintiffs rely heavily on the Supreme Court's decision in *Traverse City School Dist v Attorney General,* 384 Mich 390; 185 NW2d 9 (1971), for the proposition that defendant has refused to offer "shared time" band instruction to Brenda, thereby denying her equal protection of the law and coercing her into choosing between her constitutionally guaranteed right to freely exercise her religion and her desire for musical training. Defendant counters that it has elected not to provide any kind of shared time instruction whatsoever and is within its constitutional and statutory authority in doing so.

The Supreme Court discussed the concept of shared time instruction at length in *Traverse City, supra,* a case which involved certified questions regarding the constitutionality of Proposal C, an amendment to Const 1963, art 8, § 2. Proposal C prohibited the state or any municipality from directly or indirectly aiding private or other non-public schools. Consideration of Proposal C required the Court to consider the ramification for shared time instruction as it has existed in Michigan since 1921. The Court defined shared time as:

"an operation whereby the public school district makes available courses in its general curriculum to both public and nonpublic school students normally on the premises of the public school." 384 Mich 411, fn 3.

The Court invalidated that part of Proposal C which categorically prohibited *any* support for nonpublic school students for part-time instruction received at public institutions, holding that such a prohibition violates the free exercise of religion and equal protection of the laws guaranteed by the federal constitution. 384 Mich 414-415. In discussing the constitutional implications of the amendment, the Court stated:

"The Attorney General's interpretation of Proposal C severely curtails the constitutional right of school selection while the state interests advanced by Proposal C do not require this intrusion upon the exercise of a fundamental constitutional right. Consequently, excluding private school children from receiving shared time instruction or auxiliary services at the public school is a denial of equal protection. *This does not mean that a public school district must offer shared time instruction or auxiliary services; it means that if it does offer them to public school children at the public school, nonpublic*

*school students also have a right to receive them at the public school.*

"When a private school student is denied participation in publicly funded shared time courses or auxiliary services offered at the public school because. of his status as a nonpublic school student and he attends a private school out of religious conviction, he also has a burden imposed upon his right to freely exercise his religion. The constitutionally protected right of the free exercise of religion is violated when a legal classification has a coercive effect upon the practice of religion without being justified by a compelling state interest. * * * As pointed out above, there are no compelling state interests advanced by Proposal C which justify the burden placed on the choice of attending a private school out of a religious conviction." (Citations omitted; emphasis added.) 384 Mich 432-433.

When this language is considered together with the Court's definition of "shared time", it is clear that the Supreme Court meant that, while participation in shared time instruction could not turn on the status of the student seeking to participate, the initial decision to offer shared time instruction is discretionary with the local school district. Only after the initial decision to offer shared time instruction has been made are the constitutional strictures of equal and nondiscriminatory treatment imposed. A school district may permissibly decline to offer any shared time instruction whatsoever; however, once it chooses to offer such instruction, participation may not depend upon the particular religious or personal convictions of the individual student.

In this case, defendant has developed and implemented a policy of nonadmission to its courses to any but full-time resident students. Defendant has developed and administered its policy on a consistent and evenhanded basis. It has not denied

Brenda Snyder admission to its band class because of her religious beliefs. The district has simply elected not to make its courses available to non-public school students. *Traverse City, supra,* indicates that it was within its rights to do so. Consequently, plaintiffs' remedy is not with the courts but, rather, to elect a school board which will change the district's policy.

Decisions of the United States Supreme Court, with which *Traverse City, supra,* is fully consistent, support the conclusion that defendant's policy in no way contravenes the First and Fourteenth Amendments to the United States Constitution. In fact, these cases demonstrate that this case presents no bona fide constitutional issue.

In *Norwood v Harrison,* 413 US 455; 93 S Ct 2804; 37 L Ed 2d 723 (1973), the Court rejected the contention that a state's refusal to lend free textbooks to racially discriminatory nonpublic schools constituted an invidious classification and denied equal protection simply because the parents had chosen to exercise their constitutionally protected right to send their children to nonpublic schools. Although that dispute involved racial discrimination, the Court discussed at length the implications of the First Amendment in resolving the permissible boundaries of state aid to nonpublic schools. The Court noted that, while the appellees had intimated that the state *must* provide assistance to private schools equivalent to that it provides to public schools,

"Clearly, the State need not. Even as to church-sponsored schools * * *, any absolute right to equal aid was negated, at least by implication, in *Lemon v Kurtzman,* 403 US 602; 91 S Ct 2105; 29 L Ed 2d 745 (1971)." 413 US 462.

The Court further noted that, since the religion clauses of the First Amendment strictly confine state aid to sectarian education, a state could rationally conclude as a matter of legislative policy that constitutional neutrality as to sectarian schools might be best achieved by withholding all assistance. *Id.*

Plaintiffs have cited *Pierce v Society of Sisters,* 268 US 510; 45 S Ct 571; 69 L Ed 1070 (1925), for the proposition that their constitutional right to send Brenda to a nonpublic school requires defendant to open its band classes to her. However, the Supreme Court, in *Norwood, supra,* 413 US 462, explicitly rejected that contention:

"In *Pierce* the Court affirmed the right of private schools to exist and to operate; it said nothing of any supposed right of private or parochial schools to share with public schools in state largesse, on an equal basis or otherwise. It has never been held that if private schools are not given some share of public funds allocated for education that such schools are isolated into a classification violative of the Equal Protection Clause. It is one thing to say that a State may not prohibit the maintenance of private schools and quite another to say that such schools must, as a matter of equal protection, receive state aid."

Other courts have, in conformity with *Norwood,* rejected claims similar to those advocated by plaintiffs herein. In *Luetkemeyer v Kaufmann,* 364 F Supp 376 (WD Mo, 1973), *aff'd* 419 US 888; 95 S Ct 167; 42 L Ed 2d 134 (1974), the Court held that a Missouri statute which provided bus transportation to public students but not to nonpublic students did not unconstitutionally deny equal protection and due process to nonpublic school children by forcing them to forego their free exercise rights. There, the Court reiterated that *Pierce* did not

imply that the constitution required all services which a state may decide to provide to public schools must also be provided to nonpublic schools. Similarly, the court in *Cook v Griffin,* 47 App Div 2d 23; 364 NYS2d 632 (1975), held that there was no equal protection violation in refusing to provide bus transportation to nonpublic school students for a field trip. In so holding, the Court noted:

"[W]e are dealing not with the question of what a school district may do but what it must do." 47 App Div 2d 28; 364 NYS2d 637.

*Norwood* and its sequels compel the conclusion that the proper standard of review for defendant's policy is *not,* as plaintiffs aver, the "compelling state interest" standard, but rather the "rational relationship" standard. The *Luetkemeyer* Court, citing *McGowan v Maryland,* 366 US 420; 81 S Ct 1101; 6 L Ed 2d 393 (1961), for its choice of the rational relationship standard, held that the plaintiffs were required to establish that the state decision to deny bus transportation to nonpublic school students was wholly arbitrary and capricious. *Luetkemeyer, supra,* 382.

In this case, defendants state that the reasons for their full-time residency policy include the fact that admission of part-time students would cause a dilution of the school program for regularly enrolled students and a disproportionate taking of scarce resources, the administrative and educational advantages in full-time attendance in a single school, and that permitting part-time admission would cause an overall decline in full-time student enrollment resulting in a decline of state aid. We agree with defendants that these reasons are rationally related to the operation of a public school district. In any event, they indicate that the

district's policy is certainly not arbitrary or capricious.

In addition, there was testimony at trial indicating that implementation of a shared time program would require extensive coordination between the Charlotte public schools and nonpublic schools, a notion which itself evokes the spectre of unconstitutionality. In *Meek v Pittenger,* 421 US 349; 95 S Ct 1753; 44 L Ed 2d 217 (1975), the Supreme Court stated that the continuing need for surveillance over the integration of public and nonpublic curricula and functions presented too great a potential for "entanglement", resulting in a violation of the First Amendment. In *Americans United for Separation of Church & State v Porter,* 485 F Supp 432, 440 (WD Mich, 1980), the court stated that "monitoring is itself an indicator of excessive entanglement".

The potential for excessive entanglement required by the coordination of public and nonpublic school students' activities disposes of plaintiffs' argument that Brenda has an unrestricted statutory right to attend courses at defendant's schools. Although MCL 380.1147; MSA 15.41147 provides that a school district resident has a right to attend school in the district, that right is subject to the limitations of the First Amendment. Indeed, it may be argued that if plaintiff has the right to attend band classes notwithstanding defendant's full-time residency policy, her right extends to chemistry, art, and other classes without restriction, resulting in a situation similar to that struck down in *Porter,* where the religious school was able to offer a full curriculum while supporting only part of it. While this Court's decision in *Citizens to Advance Public Education v State Superintendent of Public Instruction,* 65 Mich App

168; 237 NW2d 232 (1975), *lv den* 397 Mich 854 (1976), cited by all parties to this appeal, upheld an arrangement of shared time secular educational programs operated on premises leased from nonpublic schools, the decision may well be of dubious constitutionality if the *Porter* analysis is followed by the federal courts. In fact, the Michigan Supreme Court anticipated the holding of *Meek, supra,* that extensive coordination of activities between public and nonpublic schools posed too great a potential for entanglement when it remarked in *Traverse City, supra,* 384 Mich 417:

"It should be needless to observe special circumstances not considered above may create unconstitutional religious entanglements, but shared time in and of itself does not."

In sum, defendant's policy of enrolling only full-time students in its courses does not deny to Brenda Snyder the free exercise of religion guaranteed by the First Amendment. Nor does its policy violate the Michigan Constitution of 1963, art 1, § 4, which is subject to interpretation similar to that of the First Amendment to the United States Constitution. *Advisory Opinion re Constitutionality of PA 1970, No 100,* 384 Mich 82; 180 NW2d 265 (1970), *app dis* 401 US 429; 91 S Ct 938; 28 L Ed 2d 210 (1971). Likewise, the policy does not deny Brenda the equal protection of the laws guaranteed by the Fourteenth Amendment to the United States Constitution and Const 1963, art 1, § 2.

## II. STATUTORY CONSIDERATIONS

Defendant, as a third class school district, is authorized to establish and maintain the grades,

schools, and departments or courses of study it deems necessary or desirable for the maintenance and improvement of public education. MCL 380.244(a); MSA 15.4244(a). This statutory mandate is reiterated in MCL 380.1282; MSA 15.41282. Review of a school district's actions pursuant to this grant of authority utilizes the arbitrary and capricious or abuse-of-discretion standard appropriate to administrative bodies. The presumption is in favor of the reasonableness and propriety of the board's actions. *Hiers v Detroit Superintendent of Schools,* 376 Mich 225, 234-235; 136 NW2d 10 (1965). We do not believe defendant's refusal to enroll Brenda in band class was such an abuse of discretion. This action was taken pursuant to the district's long-standing and reasonable policy of requiring full-time enrollment in its schools.

Nevertheless, plaintiffs argue that defendant was required to enroll Brenda in band class pursuant to its statutory duties respecting "auxiliary services". This argument is untenable, however, because band instruction is not an auxiliary service.

Local school districts are empowered by statute to provide certain auxiliary services for their students. MCL 380.1296; MSA 15.41296 provides:

"The board of a school district that provides auxiliary services specified in this section to its resident pupils in the elementary and secondary grades shall provide the same auxiliary services on an equal basis to pupils in the elementary and secondary grades at nonpublic schools. The board may use state school aid to pay for the auxiliary services. The auxiliary services shall include health and nursing services and examinations; street crossing guards services; national defense education act testing services; teacher of speech and language services; school social work services; school psychological services; teacher consultant services for handi-

capped pupils and other ancillary services for the handicapped; remedial reading; and other services determined by the legislature. Auxiliary services shall be provided under rules promulgated by the state board."

As the statute indicates, the state board of education is authorized to promulgate rules governing the provision of auxiliary services. Rule 340.292 of the Michigan Administrative Code describes which services are included within the statutory authorization. These include health and nursing examinations, speech correction services and remedial reading services. Band instruction is conspicuously absent.

Auxiliary services were discussed by the Michigan Supreme Court in *Traverse City, supra,* 384 Mich 418-419, where it stated:

"By statutory definition and practical application, auxiliary services are special educational services designed to remedy physical and mental deficiencies of school children and provide for their physical health and safety. Functionally, they are general health and safety measures.

\* \* \*

"Since auxiliary services are general health and welfare measures, they have only an incidental relation to the instruction of private school children. They are related to educational instruction only in that by design and purpose they seek to provide for the physical health and safety of school children, or they treat physical and mental deficiencies of school children so that such children can learn like their normal peers."

Plaintiffs argue that the *Traverse City* Court did not distinguish between shared time and auxiliary services, implying that the two concepts are interchangeable. This assertion is incorrect. The language quoted above clearly indicates that the

Court recognized the characteristic health and safety nature of auxiliary services. Shared time, on the other hand, includes the provision of any course which the local school district chooses to offer.

Band instruction cannot be construed to be an auxiliary service under the statute or the implementing rule. Further, the Supreme Court in *Traverse City, supra,* 384 Mich 420, noted that certain restrictions attend the provision of auxiliary services:

"Of course, what this Court holds regarding auxiliary services is limited to those services enumerated in the auxiliary services act. The clause in the act which states that auxiliary services shall include 'such other services as may be determined by the legislature' does not give the legislature a blank check to make any service a health and safety measure outside the reach of Proposal C simply by calling it an auxiliary service."

Consequently, the argument that defendant has a statutory duty to provide band instruction to Brenda as an auxiliary service has no basis in fact or logic and is rejected.

Finally, we note briefly that plaintiffs' claim that the trial judge demonstrated bias is meritless. In *S C Gray, Inc v Ford Motor Co,* 92 Mich App 789; 286 NW2d 34 (1979), this Court stated that it is presumed that a trial judge is fair and impartial, and a litigant who would challenge that has a heavy burden. Plaintiffs have not met this burden. The transcript clearly reveals that the trial judge decided this dispute on the applicable and appropriate principles of law.

### III. Conclusion

Plaintiffs' contention that the provision of auxil-

iary services and shared time instruction is mandatory under the *Traverse City* decision is simply without foundation. The *Traverse City* decision did not alter the board's authority to establish attendance policies or curricula, nor did it alter the scope of the board's discretion in providing auxiliary services. Defendant's contention that it was not required to offer band instruction as an auxiliary service, and that it was not required to offer any shared time instruction whatsoever, is correct.

We find no violation of plaintiffs' constitutional rights in the denial of band instruction to Brenda Snyder at the public school. Likewise, we find no statutory violation by defendant in its full-time residency policy. While defendant certainly had the discretion to offer shared time band instruction, this Court finds no authority to require defendant to do so.

The decision of the trial court is affirmed.

D. E. HOLBROOK, JR., P.J., concurred.

T. M. BURNS, J. *(dissenting)*. I cannot agree with the majority's conclusion that defendant's policy "does not deny to Brenda Snyder the free exercise of religion guaranteed by the First Amendment". The thrust of this argument is that defendant is not discriminating against plaintiffs because of their religious beliefs. Instead, defendant's policy merely "evenhandedly" pre-empts Brenda from taking band instruction. The majority silently assumes that, because plaintiffs do not have to send Brenda to the parochial school, they have made their choice and must abide by it. However, plaintiffs really have no choice. They sent Brenda to the parochial school in obedience to their religious dictates. Unfortunately, this school does not offer band and defendant's policy precludes enrolling in

the public school band class. Therefore, defendant's neutral policy discriminates in its application against those who exercise their right to send their children to a parochial school. The majority ignores the constitution's clear mandate to "accommodate religion".

Defendant's policy undoubtedly discriminates by limiting admission to full-time public school students within the school district. The real issue is whether or not this discriminatory policy is permissible. Courts will uphold any categorization which is sufficiently justified. If the categorization involves either a suspect class or a fundamental interest, the discriminating agency must demonstrate a compelling state interest. However, where neither of these classifications is involved, the agency need only show a rational basis between the purpose and the categorization.

Plaintiffs argue that defendant's categorization impinges on their right to freely exercise their religious beliefs. If so, a fundamental interest has been violated. *Heffron v International Society for Krishna Consciousness, Inc,* 452 US 650; 101 S Ct 2559; 69 L Ed 2d 298 (1981); *Wooley v Maynard,* 430 US 705; 97 S Ct 1428; 51 L Ed 2d 752 (1977).

However, defendant's rule does not on its face discriminate against the exercise of religious beliefs. Instead, it discriminates between public and nonpublic students. Thus, on its face, the policy involves neither a suspect class nor a fundamental interest.

But this analysis does not end the discussion because a facially neutral rule may impermissibly discriminate in its application. Defendant is obligated to provide a minimum level of education to every student within its geographical jurisdiction.

Const 1963, art 8, § 2. This duty would include those students now attending private and parochial schools if those schools did not exist.

However, since those schools do in fact exist does defendant have the duty to offer band instruction to those students whose parochial schools do not provide it? Defendant need not offer band instruction to anyone. However, having offered band, defendant may not discriminate against those students exercising their religious beliefs. In *Widmar v Vincent*, 454 US 263; 102 S Ct 269; 70 L Ed 2d 440 (1981), a university denied access for religious services to a religious group to facilities generally open to other student groups. The Supreme Court held this to be impermissible religious discrimination. However, had the facilities not been open to other clubs, the university would not have been required to open the facilities for worship services. See *Trietley v Bd of Ed of the City of Buffalo*, 65 App Div 2d 1; 409 NYS2d 912 (1978).

Plaintiffs correctly do not contend that defendant must show a compelling state interest for excluding all nonpublic students. In addition to students like Brenda who attend a parochial school in compliance with the dictates of their religious beliefs, nonpublic students include those who attend secular private schools and those who attend parochial schools for nonreligious reasons. Discrimination against these groups may be justified by a rational basis.

Plaintiffs do, however, contend that defendant must demonstrate a compelling state interest to discriminate against them. No one can dispute plaintiffs' right to send Brenda to parochial school in compliance with their religious beliefs. *Pierce v Society of Sisters*, 268 US 510; 45 S Ct 571; 69 L

Ed 1070 (1925). Furthermore, no one has challenged the sincerity of plaintiffs' religious beliefs.

Our society is very diverse. For differing reasons, families send their children to parochial schools. Some believe that the state schools are not suitable for everyone. Some believe that such cultic symbols and rituals as prayer are important in a child's life and education and that the public school system shows hostility toward these rituals by ignoring them. Others believe the public school is in fact teaching a religion—the state's fundamental viewpoint—which is antithetical to their religious beliefs. They, therefore, exercise their right to the free expression of their religious beliefs by sending their children to schools which incorporate their religious principles in every course. Still others believe that, while a neutral education is in fact possible and may in fact be taught in the public schools, their children should be instructed according to the families' religious views. In certain cases, for any of these reasons, the parents really have no choice but to send their children to a school giving such religious training.

Once plaintiffs have chosen to exercise this fundamental religious right, may defendant force them to choose between giving Brenda band instruction and continuing to send her to the parochial school? In essence, whether intentionally or not, defendant is denying band instruction to Brenda Snyder simply because she and her family have exercised this right. Defendant's policy requires plaintiffs to violate their religious principles as the price for offering Brenda band instruction. Such religious discrimination, stemming from the application of a neutral rule, was soundly condemned in *Sherbert v Verner,* 374 US 398, 404, 406; 83 S Ct 1790; 10 L Ed 2d 965 (1963):

"It is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial or a placing of conditions upon a benefit or privilege. * * * [T]o condition the availability of benefits upon this appellant's willingness to violate a cardinal principle of her religious faith effectively penalizes the free exercise of her constitutional liberties."

There, a Seventh-Day Adventist had been fired from her work because she had refused to work on Saturday. Because she refused employment from other businesses for the same reason, she was denied unemployment benefits. Although the rule requiring employment compensation applicants to accept work on Saturday was proper, in this case it violated her First Amendment right in its application:

"Here not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand." 374 US 404.

The same analysis was used in *Wisconsin v Yoder,* 406 US 205; 92 S Ct 1526; 32 L Ed 2d 15 (1972). There, a facially neutral compulsory school attendance law was found to violate the right of religious expression guaranteed to the Amish who believed that education for their children should cease after the sixth grade. The Supreme Court recognized that a neutral regulation could in its application offend the constitutional requirement of governmental neutrality by unduly burdening the free exercise of religious beliefs and required the state, as a condition of its neutrality toward religious beliefs, to *accommodate* the Amish:

"The Court must not ignore the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause, but that danger cannot be allowed to prevent any exception no matter how vital it may be to the protection of values promoted by the right of free exercise." 406 US 220-221.

In *Thomas v Review Board of the Indiana Employment Security Division,* 450 US 707; 101 S Ct 1425; 67 L Ed 2d 624 (1981), the Supreme Court (with only one dissent) upheld *Sherbert.* There, a Jehovah's Witness left his job because of his religious convictions after being transferred to a munitions factory. Because he refused to work there, he was denied unemployment compensation benefits. The Supreme Court held that the government had violated his right to freely exercise his religious beliefs when it imposed such a condition on him:

"[A] person may not be compelled to choose between the exercise of a First Amendment right and participation in an otherwise available public program. * * *

     *   *   *

"Where the state conditions receipt of an important benefit upon conduct proscribed by religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." 450 US 716-718.

These cases are summed up as follows:

"For a First Amendment claim to be valid, the claimant's theological conviction must be sincere * * *. In addition, the conviction must be founded upon religious,

not secular beliefs. * * * If these two conditions are met, the First Amendment guarantees freedom of belief and can grant freedom to act in accordance with those beliefs. * * *

* * *

"What is required is not only an absence of discrimination, protected under other constitutional guarantees, but a constitutional obligation imposed upon secular government by the free exercise clause of the First Amendment, to 'accommodate' religion. *Zorach v Clauson*, 343 US 306; 72 S Ct 679; 96 L Ed 954 (1952)." *City of Sumner v First Baptist Church of Sumner, Washington*, 97 Wash 2d 1; 639 P2d 1358, 1366 (1982) (Utter, J., concurring).

The majority and defendant however contend that the policy does not constitute religious discrimination. The arguments have been summed up and accepted in *Thomas v Allegheny County Bd of Ed*, 51 Md App 312; 443 A2d 622, 625 (1982), where the all-county music program was made available only to public school children:

"The decision to confine participation in the All-County Band to public school students does not infringe upon the private school students' freedom of religion. The rule neither prohibits a parent from enrolling the child in a private school, nor deters the students from following the practices of their faith."

What this argument fails to recognize is that the First Amendment encompasses religious practices in addition to beliefs. *Contwell v Cannecticut*, 310 US 296; 60 S Ct 900; 84 L Ed 1213; 128 ALR 1352 (1940). Furthermore, even if defendant's policy does not directly prevent plaintiffs from practicing their religion by sending their daughter to parochial school, and even though their religious beliefs do not require them to enroll Brenda in the

band, defendant's policy nevertheless violates their rights to freely exercise their religious beliefs:

"It is argued that because the regulation here involved does not impact directly a fundamental tenet of the church, it does not violate a member's First Amendment rights. Direct impact, however, has never been a requirement. It was not against a fundamental tenet of the Amish to send their children to high school; it was the incidental effects of that requirement the Amish believed to be detrimental to their faith and hence violative of their First Amendment rights. *Wisconsin v Yoder, supra.* It was not a fundamental tenet of the Catholic faith that unionization of teachers be disallowed; yet the Supreme Court indicated that for the National Labor Relations Board to become involved regarding parochial school teachers could pose a significant risk of infringement on the free exercise of religion. *NLRB v Catholic Bishop of Chicago,* 440 US 490; 99 S Ct 1313; 59 L Ed 2d 533 (1979).

"It was not a fundamental tenet of 'born again' Christians to not allow teaching of basic education 4 hours each day; yet the pernicious though incidental effect of allowing state regulation regarding mandatory subjects and allocation of classroom time has been held to violate the free exercise clause as to that religious group. *State v Whisner* [47 Ohio St 2d 181; 351 NE2d 750 (1976)]. Neither is it a fundamental tenet to employ substandard teachers in a parochial school; yet it has been held that a state cannot require nonpublic teachers to have 'essentially equivalent' qualifications to those in public schools. *State v LaBarge,* 134 Vt 276; 357 A2d 121 (1976)." *City of Sumner v First Baptist Church of Sumner, Washington,* 97 Wash 2d 1; 639 P2d 1358, 1362 (1982).

Defendant's policy violates plaintiffs' First Amendment rights by conditioning their right to enroll Brenda in the school band on their choosing to forego their First Amendment right to educate her in a parochial school. Defendant counters with

*Valencia v Blue Hen Conference,* 476 F Supp 809
(D Del, 1979), where an unincorporated association
of public high schools had excluded parochial
schools from membership. In comparing the bur-
den on the plaintiffs with the burdens imposed in
*Yoder* and in *Sherbert,* the Court noted:

"The burden complained of in this case pales by
comparison. * * * In light of the minimal degree of the
burden imposed on the plaintiffs and the remoteness of
it to the exercise of their religion, the Court seriously
doubts that the defendants' actions infringe upon any
rights protected by the Free Exercise Clause." 476 F
Supp 822.

However, the issue is not simply how much
plaintiffs' rights have been burdened, but rather
whether or not this burden can be sufficiently
justified by the reasons advanced by defendant.
Defendant's responsibility is to be neutral in the
face of religious differences. *School Dist of Abing-
ton Twp, Pa v Schempp,* 374 US 203, 225; 83 S Ct
1560; 10 L Ed 2d 844 (1963); *Everson v Bd of Ed of
Ewing Twp,* 330 US 1; 67 S Ct 504; 91 L Ed 711
(1947). *Student Members of the Playcrafters v Bd
of Ed of Teaneck Twp,* 117 NJ Super 66; 424 A2d
1192 (1981), states: "[T]he First Amendment does
not mandate hostility or callous indifference to
religious practices. To do so would be to prefer
those who do not believe in a religion over those
who do". In addition, what may appear to one
person to be a minor infringement on another's
rights may in fact be a critical infringement. No
one knows what Leontyne Prices, Leonard Bern-
steins, or Ira Gershwins would have been lost if
their parents had been forced to make a choice
like the one plaintiffs face.

Similar conditioned choices have been con-

demned in *State ex rel Hughes v Kanawha County Bd of Ed,* 154 W Va 107; 174 SE2d 711 (1970), *app dis* 403 US 944; 91 S Ct 2274; 29 L Ed 2d 854 (1971), where the school board had provided transportation only for public school students. The West Virginia Supreme Court held that this action impermissibly discriminated against parochial school students because of their religious beliefs:

"In recognition of pertinent constitutional guarantees of religious freedom, the legislature of this state has provided that, in counties in which both public and Catholic parochial primary and secondary schools are maintained, parents of Catholic children may elect to have their children attend parochial schools. The statute, we believe, merely expresses a right guaranteed by constitutional provisions.

"It is quite true that a Catholic child clearly would be afforded school bus transportation by the mere expedient of electing to attend a public school. We are of the opinion, however, that the denial to children attending Catholic parochial schools of equal rights of bus transportation accorded to children attending public schools deprives Catholic children and their parents of their right of religious freedom in violation of the provisions of the First Amendment of the Constitution of the United States." 154 W Va 120.

In *Members of the Jamestown School Committee v Schmidt,* 405 A2d 16, 21 (RI, 1979), the Rhode Island Supreme Court stated:

"Indeed, the General Assembly is merely responding to the dictates of the mandatory education law * * * by enabling all citizens to comply easily and safely with that law. See *State ex rel Hughes v Bd of Ed,* 154 W Va at 117; 174 SE2d at 718. In a sense, busing is a tool for enforcing the duty of compulsory education of minor children that states place upon parents. * * * The United States Supreme Court has held that parents, acting under a state compulsory-education law, may

send their children to state-approved religious schools. * * * We would thus be fostering an anomaly if we held that the state is only obligated under [the law] to assist those parents who choose public over private schools * * *."

In *Alexander v Bartlett,* 14 Mich App 177, 182; 165 NW2d 445 (1968), this Court held that providing bus transportation to parochial school children does not violate the Establishment Clause. In doing so, this Court specifically noted: "[G]iving full meaning and effect to [this law], as a whole, results in maintaining the neutrality of the government toward religion, safeguards the free exercise of religion, and prohibits the establishment of religion."

While citing *Traverse City School Dist v Attorney General,* 384 Mich 390; 185 NW2d 9 (1971), the Nebraska Supreme Court stated in *State ex rel School Dist of Hartington v Nebraska State Bd of Ed,* 188 Neb 1, 5; 195 NW2d 161, 164 (1972), *cert den* 409 US 921; 93 S Ct 220; 34 L Ed 2d 182 (1972):

"It would seem that to deny a student the right to participate in a program offered by a public school district solely because that student is enrolled in a parochial school would violate that student's right to a free exercise of religion and to equal protection of the law."

In *Epeldi v Engelking,* 94 Idaho 390; 488 P2d 860 (1971), *cert den* 406 US 957; 92 S Ct 2058; 32 L Ed 2d 343 (1972), the court (3-2) held that providing bus transportation for parochial students violated Idaho's Establishment Clause. However, the dissent noted:

"To deny to parochial school children the benefit of

transportation because of the fact they choose to attend a parochial school denies them Equal Protection. The denial by such a classification is unreasonable. There is nothing ideological, sectarian or religious about a bus. All children should share the benefits of public transportation. The transportation should be provided the student, not because he attends a certain school but because he is a child within a certain classification properly created by the legislature." 94 Idaho 400 (McQuade, C.J., *dissenting*).[1]

Finally, in *Traverse City School Dist v Attorney General, supra,* our Supreme Court ruled that the section in Proposal C prohibiting "shared time" services to nonpublic school students was unconstitutional:

"It violates both the free exercise of religion and the equal protection provisions of the United States Constitution.

\*   \*   \*

"When a private school student is denied participation in publicly funded shared time courses or auxiliary services offered at the public school because of his status as a nonpublic school student and he attends a private school out of religious conviction, he also has a burden imposed upon his right to freely exercise his religion. The constitutionally protected right of the free exercise of religion is violated when a legal classification has a coercive effect upon the practice of religion without being justified by a compelling state interest.
\*   \*   \*

"In passing, it may be noted that the Attorney General in his brief argued that *Sherbert* is inapplicable. He pointed out 'Proposal C does not deal with religious schools as such but rather with all private schools whether sectarian or non-sectarian.' However, the Su-

---

[1] The majority opinion specifically relied on *Judd v Bd of Ed,* 278 NY 200; 15 NE2d 576 (1938). However, *Judd* was overruled in *Bd of Ed v Allen,* 20 NY2d 109; 281 NYS2d 799; 228 NE2d 791 (1967), *aff'd* 392 US 236; 88 S Ct 1923; 20 L Ed 2d 1060 (1968).

preme Court of the United States in matters of racial discrimination looks to the 'impact' of the classification. * * * This same principle should apply to the First Amendment's protection against religious discrimination and here with 98 percent of the private school students being in church-related schools the 'impact' is nearly total." 384 Mich 412, 433-434. (Footnote omitted.)

Thus, *Traverse City* clearly states that, once a program is offered to the students in a school district, the school board may not exclude nonpublic school students merely because they have exercised their rights to freely exercise their religious beliefs by attending a parochial school.

I note that the Supreme Court also stated:

"This does not mean that a public school district must offer shared time instruction or auxiliary services; it means that if it does offer them to public school children at the public school, nonpublic school students also have a right to receive them at the public school." 384 Mich 433.

The majority and defendant interpret this statement as forbidding discrimination between parochial and secular private school students where a school district has already elected to offer shared time services; however, the school district need not offer such services in the first place.

While a cursory reading of this language may suggest this interpretation, the essence of the opinion itself strongly contradicts it. A correct interpretation of this language depends on the definition of "shared time". In the majority's and defendant's view, "shared time" is merely a course which may be offered instead of a concept of educating the public at large through the public school resources. If this interpretation were correct, then "shared time" would simply be like an

auxiliary service which need not be offered to the public, but which, once offered, must be offered on a nondiscriminatory basis. However, because "shared time" is really a *method* of using school resources, it cannot be equated with such nonmandatory services. The majority's interpretation ignores the Supreme Court's analysis which I have been following.

Even though defendant's policy is discriminatory, it is permissible if compelling interests support it. The majority's and defendant's first "compelling interest" is administrative convenience. *Thomas v Allegheny County Board, supra,* explained this argument:

"On the other side of the scale, it appears that the Board has a legitimate interest in confining public school programs to public students. Although the administrative impact of a decision mandating the participation of the private students into this public school program appears to us to be trivial, the precedent as it affects the broader spectrum of school administration is of a far more deleterious nature. With the opening of such 'Pandora's box', there would be no device to preclude, for example, a private school having difficulty securing a qualified chemistry teacher from unilaterally deciding to transport the entire student body to a nearby public school for their chemistry education. The potential for administrative disruption is obvious. Thus, while we may agree that little if any administrative hardship would inure to the Board in permitting these three students to participate in the All-County Band, it is not for this Court to hold that the Board *must* admit them, in view of the broader implications involved. We think the school administrators and not courts, should decide how much administrative disruption is too much." 443 A2d 625-626.

This "floodgates" argument aside, the administra-

tive inconvenience occasioned by Brenda Snyder's request is extremely minimal. Not only will plaintiffs provide the transportation to and from the public school, but Brenda has her own instrument. Furthermore, plaintiffs, and all others similarly situated, must accommodate themselves to defendant's reasonable regulations. Defendant certainly has the right to require anyone applying for band to apply within a reasonable amount of time and is under no obligation to offer band instruction at a time to fit plaintiffs' convenience.

It is, therefore, understandable that the majority focuses on the possibility of large numbers of nonpublic students demanding entrance to any course they desire. Thus the focus is on sheer numbers. While I understand this concern, I believe it to be overstated. Preliminarily, I note that if all students decided to join the public school, defendant would have to accommodate each one of them.

However, not every nonpublic student would be involved in this situation. First, the administrative inconvenience projected by defendant may well satisfy the rational basis test as to students who attend nonpublic schools for reasons other than their religious dictates. A state may inquire into the sincerity of a person's religious beliefs. *Ballard v United States,* 329 US 187; 67 S Ct 261; 91 L Ed 181 (1946).

Second, one can strongly question just how sincere a parochial school's and the parents' religious convictions are if the parochial school unilaterally decides to drop chemistry and have its student body take it at a public school. These parents would not have been given the same coercive choice that plaintiffs have been given. Such a decision appears more to have been made out of

convenience than out of a conviction that this particular form of religious education is necessary.

Third, as a practical matter, those students in Brenda Snyder's position must accommodate themselves to reasonable administrative regulations and class times. This alone will limit the number of parochial students seeking admission. In addition, defendant maintains reasonable control over class size, curriculum, and budgetary matters; although defendant may not discriminate on the basis of religion, defendant is entitled to limit class size or even decide not to offer a nonmandatory class such as band where necessary. Given this situation, it is unlikely that parents of parochial students will depend solely on the public school system to provide the courses they perceive as necessary to a well-rounded education.

In addition, defendant overlooks the main reason many families send their children to parochial schools. To these families, every course is to be taught in obedience to God's will. They have sent their children to parochial schools precisely to allow their children to be taught according to this world and life view which encompasses literature, scientific reasoning and music as well as philosophy and theology. Such people are not necessarily very likely to unilaterally drop a course like chemistry.

The majority also argues that defendant will be forced to use scarce resources if it is compelled to accept Brenda Snyder into the band. However, although everyone in the state is contributing to public education, only the public schools, and the public school children, are receiving the tax money. Would allowing Brenda Snyder into band really be disproportionate? I again note that defendant obviously would be completely obligated to

offer all courses to her on a nondiscriminatory basis if Brenda decided to attend the public school full time.

On the other hand, the majority also argues that permitting students like Brenda Snyder to attend individual classes instead of enrolling as full-time students will encourage them to attend parochial schools, thus reducing the number of full-time students and thus also reducing state funding. However, while the First Amendment does not require defendant to encourage a student's attending a parochial school, it does require defendant to accommodate plaintiffs' free exercise of their beliefs. *Yoder, supra.* The incidental effect may be to encourage the attendance of parochial schools, but the First Amendment will not tolerate discrimination as the alternative. In addition, as I stated earlier, I do not believe that defendant's fears would actually materialize.

The majority last argues that a contrary decision could lead to excessive entanglement. First, however, as noted above, plaintiffs must accommodate themselves to the public schools' reasonable administrative regulations. Second, the majority ignores the fact that Michigan state courts have so far held that shared time does not violate the Establishment Clause. *Traverse City, supra; Citizens to Advance Public Education v State Superintendent of Public Instruction,* 65 Mich App 168; 237 NW2d 232 (1975), *lv den* 397 Mich 854 (1976). The majority counters with *Luetkemeyer v Kaufmann,* 364 F Supp 376 (WD Mo, 1973), *aff'd* 419 US 888; 95 S Ct 167; 42 L Ed 2d 134 (1974), which ruled that Missouri's constitution requiring even greater separation of church and state than the United States Constitution provided the compelling state interest to allow the state to discrimi-

nate between public and nonpublic students in providing bus transportation. However, Missouri's constitution was specifically held insufficient by the United States Supreme Court in *Widmar, supra,* 454 US 276; 102 S Ct 277; 70 L Ed 2d 451:

"On one hand, respondents' First Amendment rights are entitled to special constitutional solicitude. Our cases have required the most exacting scrutiny in cases in which a State undertakes to regulate speech on the basis of its content. * * * On the other hand, the State interest asserted here—in achieving greater separation of church and State than is already ensured under the Establishment Clause of the Federal Constitution—is limited by the Free Exercise Clause and in this case by the Free Speech Clause as well. In this constitutional context, we are unable to recognize the State's interest as sufficiently 'compelling' to justify content-based discrimination against respondents' religious speech."

Furthermore, Michigan's constitution does not require a greater separation of church and state; therefore, no compelling state interest has been shown. In fact, Justice White, joined by Chief Justice Burger, wrote the following dissenting opinion in *Luetkemeyer:*

"[T]he 'benefits of public welfare legislation'—here a 'general program to help parents get their children * * * safely and expeditiously to and from accredited schools,' * * * seem to be denied because certain students are seeking religious training. Without a valid interest supporting the different treatment accorded public school and parochial school students, that classification would violate federal equal protection principles. Moreover, the arbitrariness of the denial of a general public service raises the question whether the State has not become the 'adversary' of the religion and has placed burdens on appellants' free exercise rights." 419 US 891.

I believe that *Luetkemeyer's* precedential value is somewhat questionable.

I also realize that some federal cases have declared certain shared time provisions unconstitutional. *E.g., Americans United for Separation of Church & State v School Dist of the City of Grand Rapids,* 546 F Supp 1071 (WD Mich, 1982); *Americans United for Separation of Church & State v Porter,* 485 F Supp 432 (WD Mich, 1980). However, we are presently bound by our own Supreme Court's decision that shared time does not violate the Establishment Clause. *Traverse City, supra.* Furthermore, the present case presents far less establishment problems than the plans reviewed in these federal cases. In addition, where the Establishment Clause conflicts with the Free Exercise Clause, the Free Exercise Clause must prevail. *Resnick v East Brunswick Twp Bd of Ed,* 77 NJ 88; 389 A2d 944 (1978).

If Brenda Snyder were handicapped and attended, to obtain special education necessary to live a full life, a school for the handicapped within defendant's jurisdiction that did not offer band instruction, we would readily find that defendant would be invidiously discriminating against her if it refused to allow her to take band in a different school merely because she would not be a "full-time student" in that school, thus forcing her to choose between her special needs and musical training. See generally MCL 37.1401 *et seq.;* MSA 3.550(401) *et seq.* How is that type of discrimination any more invidious than the discrimination the majority today sanctions? The majority concludes that "plaintiffs' remedy is not with the courts but, rather, to elect a school board which will change the district's policy". Why should plaintiffs be forced to wait possibly 30 years (if ever) before being able to elect a school board willing to vindicate their constitutional rights?

I would reverse and remand with instructions to enter the appropriate injunction.